Argued and submitted December 9, 1992, affirmed September 1, 1993

FARMERS INSURANCE COMPANY
OF OREGON,
a corporation,
*Appellant,*

*v.*

Daniel M. TRUTANICH,
*Respondent.*

(9002-01206; CA A68108)

858 P2d 1332

Lisa E. Lear, Portland, argued the cause for appellant. With her on the briefs were S. Joel Wilson and Bullivant, Houser, Bailey, Pendergrass & Hoffman, Portland.

Robert E. L. Bonaparte, Portland, argued the cause for respondent. With him on the brief were Michael J. Gentry and Tooze, Shenker, Holloway & Duden, Portland.

Stephen D. Marcus, Imelda Terranzino and Claussen Miller Gorman Caffrey & Witous, P.C., Chicago, Illinois, and Jeffrey V. Hill and Zarosinski & Hill, Portland, filed a brief *amicas curiae* for Insurance Environmental Litigation Association.

Before Warren, Presiding Judge, and Riggs and Edmonds, Judges.

WARREN, P. J.

## WARREN, P. J.

In this civil action, plaintiff Farmers Insurance Company (Farmers) sought a declaration that a homeowner's insurance policy it issued to defendant Trutanich does not cover defendant's losses. Defendant counterclaimed for breach of the insurance contract and intentional infliction of emotional distress.

In November, 1988, defendant purchased a house and had it insured by Farmers with an all-risk homeowner's insurance policy. In June, 1989, defendant moved to an apartment and rented part of the house to the Greshams. Defendant left most of his personal possessions in a locked bedroom. The Greshams lived in the house for approximately 45 days, and then found a new tenant, Pixler, who, with his children, began renting the house from defendant in late August, 1989. In late September, defendant stopped by the house and found that Pixler had moved out. Upon entering the house, he noticed a strong odor, which was later determined to be from a methamphetamine lab in the lower level of the house.[1] Defendant made a claim for damages to the house and his personal property caused by the methamphetamine operation. Farmers denied the claim on the ground that the insurance contract excluded coverage for contamination. It then brought this declaratory judgment action. The trial court decided in favor of defendant on the contamination issue, as well as on other coverage issues raised by Farmers. However, it granted Farmers' motion for summary judgment on defendant's counterclaim for intentional infliction of emotional distress.[2] After the court ruled in favor of defendant on the coverage issues, it submitted the damage issues to the jury. The jury returned a verdict on defendant's counterclaim for breach of contract as follows:

| "a. | Damage to the building: | |
|---|---|---:|
| | (1) Decontamination | $ 7,050 |
| | (2) Restoration | 7,100 |
| b. | Loss of rental income | 7,200 |
| c. | Damage to personal property | 1,000 |
| d. | Theft loss of personal property | 15,750 |
| | TOTAL | $38,100" |

---

[1] The lab had been operated by three individuals who rented the lower level of the house from Pixler.

[2] The summary judgment is not at issue on appeal.

■ Farmers makes numerous assignments of error concerning the trial court's rulings on the coverage issues and attorney fees.[3] We review the trial court's rulings on coverage issues in a declaratory judgment proceeding as in an action at law and are bound by the trial court's factual findings if they are supported by any substantial evidence. *See Lindsey v. Dairyland Ins. Co.*, 278 Or 681, 688, 565 P2d 744 (1977); *C & B Livestock, Inc. v. Johns*, 273 Or 6, 10, 539 P2d 645 (1975); *Hartford v. Aetna/Mt. Hood Radio*, 270 Or 226, 229, 527 P2d 406 (1974).

■ Farmers' first and primary assignment is that the trial court erred in ruling that the contamination exclusion did not apply to the losses to the house caused by a methamphetamine operation. The insurance policy covers "accidental direct physical loss" to the premises, but excludes, among other things,

"* * * direct or indirect loss from:

"* * * * *

"6. *Wear and tear; marring; deterioration; inherent vice; latent defect; mechanical breakdown; rust; mold; wet or dry rot; contamination; smog; smoke from farm smudging or industrial operations;* settling, cracking, shrinking, bulging or expansion of pavements, patios, foundations, walls, floors, roofs or ceiling; birds, vermin, rodents, insects or domestic animals." (Emphasis in original.)

In *Largent v. State Farm Fire & Casualty Co. (A71495)*, 116 Or App 595, 842 P2d 445 (1992), *rev den* 316 Or 528 (1993), we interpreted an almost identical exclusion and held that it did not exclude from coverage damage caused by an illegal methamphetamine operation. We are not persuaded by Farmers' argument that the provision in this case is different from that in *Largent*. Consequently, we affirm the trial court on the contamination issue. *See also Shaffer v. State Farm Fire & Casualty Co.*, 120 Or App 70, 852 P2d 245 (1993).

■ Farmers' second assignment is that, even if the contamination exclusion does not apply, the court erred in ruling that defendant's losses caused by odor from the methamphetamine "cooking" constituted "direct physical loss"

---

[3] Farmers does not challenge the rulings on coverage issues concerning loss of rental income or theft loss of personal property.

within the meaning of the policy. We understand Farmers' argument to be two-fold. First, odor is not "physical." Second, even if it is, defendant is not entitled to recover the cost of removing it, because that cost is not a direct physical loss. We reject both arguments. On the first point, the trial court made a finding that "a pervasive odor persists in the house." We conclude that odor was "physical," because it damaged the house. *See Ream v. Keen*, 314 Or 370, 372, 838 P2d 1073 (1992); *Davis v. Georgia-Pacific*, 251 Or 239, 242, 445 P2d 481 (1968); *Martin v. Reynolds Metals Co.*, 221 Or 86, 89, 342 P2d 790 (1959), *cert den* 362 US 918 (1960).

On the second point, Farmers relies on *Wyoming Sawmills, Inc. v. Transportation Ins. Co.*, 282 Or 401, 578 P2d 1253 (1978). There, a lumber manufacturer sold a lumber company defective 2 × 4 studs that were used in a building. After settling the lumber company's claim against it, the manufacturer sued its insurer, under a general liability policy, to recover labor expenses for removing and replacing the defective studs. The insurer denied liability, relying on the policy language that it was only liable for "property damage," which was defined, among other things, as "physical injury to or destruction of tangible property * * *." 282 Or at 404. It argued that "the property damage that is covered by the policy is damage occasioned by the defective studs to other property, *i.e.*, the balance of the building, and that the [evidence does] not demonstrate that the labor expense incurred was occasioned by the repair of such damages." 282 Or at 405. The Supreme Court agreed:

> "The present policy defines property damages as '*physical* injury to * * * tangible property.' * * * The inclusion of this word ['physical'] negates any possibility that the policy was intended to include 'consequential or intangible damage,' such as depreciation in value, within the term 'property damage.' The intention to exclude such coverage can be the only reason for the addition of the words. As a result, *in the absence of a showing that any physical damage was caused to the rest of the building by the defective studs and that the labor cost was for the rectification of any such damage, plaintiff cannot recover*." 282 Or at 406. (First emphasis in original; second supplied; footnote omitted.)

This case is different. There is evidence that the house was physically damaged by the odor that persisted in it.

The cost of removing that odor was a direct rectification of the problem. *Wyoming Sawmills* thus is not directly applicable here. To the extent that it has any relevance, it supports the conclusion that the removal cost is a direct physical loss.[4]

We find that *Western Fire Ins. Co. v. First Presbyterian Church*, 165 Colo 34, 437 P2d 52 (1968), on which the trial court relied, is on point and persuasive. There, the insurance policy insured a church building against "all other risks of direct physical loss * * *." 165 Colo at 37. The building was closed because gasoline and vapors had "infiltrated and contaminated the foundation and halls and rooms of the church building." 165 Colo at 37. The insured sued the insurer to recover the cost of remedying the infiltration and contamination problem. The court expressly rejected the insurer's characterization that the loss was simply a "loss of use," and held that it was "a direct physical loss" within the meaning of the policy. 165 Colo at 40. Similarly, here the odor produced by the methamphetamine lab had infiltrated the house. The cost of removing the odor is a direct physical loss.

■ Farmers' third assignment is that the trial court erred in holding that the insurance policy covered damages to defendant's personal property caused by the methamphetamine operation. The policy provides, in part:

"We insure for accidental direct physical loss to property described in Coverage C [Personal Property], * * * caused only by these perils:

"* * * * *

"7. Smoke, if loss is sudden and accidental."[5]

---

[4] The case relied on by the *amicus curiae, Great Northern Ins. Co. v. Benjamin Franklin Fed. S & L Ass'n*, 793 F Supp 259 (D Or 1990), *aff'd* 953 F2d 1387 (9th Cir 1992), is similarly inapposite. There, the insured sued its insurer under a property insurance policy to recover anticipated loss in removing asbestos that existed in a building it owned. The general coverage provision provided that the insurer would pay "the loss [that] must result ... from a direct physical loss or damage by a Covered Cause of Loss." The district court relied on *Wyoming Sawmills, Inc. v. Transportation Ins. Co., supra,* and held that "direct physical loss" did not include the cost of removing asbestos, because the building had remained physically intact and undamaged by the asbestos. It also noted that asbestos was not a covered loss. 793 F Supp at 263. This case is different because the insured house had been physically damaged by the odor.

[5] Farmers does not argue that the loss to defendant's personal property was not "sudden and accidental." *Cf. North Pacific Ins. Co. v. United Chrome Products, Inc.*, 122 Or App 77, 83, 857 P2d 158 (1993).

Farmers argues that the amalgam method of manufacturing methamphetamine produces only vapor and that vapor does not constitute smoke within the meaning of the policy. The trial court ruled below, as a matter of law, that smoke includes vapor. *Cf. Stuart v. Occidental Life Ins. Co.*, 156 Or 522, 68 P2d 1037 (1937); *K & Lee Corp. v. Scottsdale Ins. Co.*, 769 F Supp 870, 873 (ED Pa 1991), *aff'd* 953 F2d 1380 (3d Cir 1992); *Capital Bank & Trust Co. v. Equitable Life Assur. Soc. of U.S.*, 542 So 2d 494 (La 1989); *contra Henri Food Products Co. v. Home Ins. Co.*, 474 F Supp 889 (ED Wis 1979). We need not decide whether the court was correct, because there is evidence of smoke, even under the definition offered by Farmers.

According to Barnes, an expert called by Farmers, smoke is defined as "vapors and a particulate matter" or as a "dispersion of a particulate matter in a vapor." The trial court found that "that seems to be what was produced by the meth[amphetamine] cooking" in this case. There is evidence to support that finding. Pixler, the tenant who rented the house, testified that he saw smoke in the room when the methamphetamine cooking was in progress. A chemical company employee hired to clean the house and a drug lab cleanup contractor both also observed smoke damage to personal property as a result of the methamphetamine cooking. Although the witnesses did not specifically testify as to the presence of any particulate matter, the trial court, as trier of fact, could conclude from their testimony that particulate was present. Consequently, we affirm the trial court on the smoke issue.[6] *See, e.g., Hartford v. Aetna/Mt. Hood Radio, supra*, 270 Or at 229.

■ Farmers' fourth, fifth and sixth assignments of error concern defendant's conduct in renting the house to a third party. We first address its argument that, because the house was rented, it was not covered. The policy provides:

"Coverage A—Dwelling

"We cover:

---

[6] Farmers does not argue that the court should have submitted the case to the jury to determine what was actually produced by the methamphetamine cooking.

"1. The dwelling, including attached structures, on the *residence premises* and used principally as a private residence." (Emphasis in original.)

"Residence premises," as defined in the policy,

"means the one or two family dwelling and separate structures or that part of any other building *where you reside*, and shown in the Declarations." (Emphasis supplied.)

In *Insurance Co. of North America v. Howard*, 679 F2d 147 (9th Cir 1982), the court interpreted a similar provision under Oregon law. There, the policy provided that it "insure[d] * * * the described residence *owned and occupied* by the insured exclusively for residential purpose[.]" (Emphasis supplied.) The insured rented her house to a third party for one year, during which it burned down. The court rejected the insurer's argument that renting the house to a third party took the house out of coverage. It reasoned that the "occupied by" language "is a description merely and is not an agreement that the insured should continue in the occupation of it." 679 F2d at 149. The court then concluded that,

"under Oregon law, if an insurance company wishes to have a homeowner's policy terminate upon rental of his home, it must so provide explicitly and unambiguously in the policy of insurance, and that a mere statement in the policy that he is the owner and occupant is wholly insufficient for this purpose. Under any proper view of the law, a homeowner is entitled to be given specific and unequivocal notice in the insurance policy that his coverage will be forfeited upon his rental of his home so that if a death in the family or economic circumstances, or even just a desire to change his way of life, cause him to move from his home, he may make whatever other insurance arrangements are necessary to protect the asset which often represents all the remaining proceeds of a life-time of labor." 679 F2d at 149. (Footnote omitted.)

The "residence premises" provision in this case is even less clear about whether the insured is required to reside at the house in order for it to be insured. The phrase "where you reside" could be grammatically interpreted to modify only "part of any other building," not "family dwelling." Even if it was meant to modify "family dwelling," we agree with the court in *Howard* that the "you reside" language alone is insufficient to take the house out of coverage.

■     Farmers also relies on the policy definition of "business" to support its argument that renting the house to a third party took the house out of coverage. In *Howard*, the insurance policy excluded from coverage buildings used for any "business." 679 F2d at 149. The term "business" did not include "the occasional rental or holding for rental of whole or any portion of the residential premises for dwelling purposes." 679 F2d at 149. The court questioned the applicability of that exclusion to the covered premises. 679 F2d at 149 n 3. In any event, the court ruled that the insured's rental was an "occasional rental," and that the business exclusion did not apply. 679 F2d at 149. Here, however, the term "business" is not used as an exclusion from coverage. Rather, it is used mainly with respect to Coverage C — Personal Property, to provide a dollar limit on coverage of "business property." It has no relation to Coverage A — Dwelling.[7] Moreover, the policy itself specifically provides for coverage for loss of use of "residence premises rented to others or held for rental[.]" The trial court correctly ruled that the house was covered, even though it was rented.

Farmers' other arguments concern the applicability of ORS 742.216, which provides, in part:

"A fire insurance policy shall contain a provision as follows: 'Unless otherwise provided in writing added hereto this company shall not be liable for loss occurring:

"(1)    'While the hazard is increased by any means within the control or knowledge of the insured[.]' "

Farmers argues that that provision became part of the contract by operation of law and that defendant's renting the house to a third party and the manner in which it was rented increased the hazard and thus voided the coverage. It also argues that the trial court erred in not allowing the jury to consider whether defendant's conduct in renting the house constituted an increase in hazard. Neither argument has merit.[8]

---

[7] Although at the time of the insurance application, defendant represented to Farmers that his house would not be used for business purposes or be rented, the insurance contract did not reflect that. Nor does Farmers, on appeal, argue that defendant's representations should be part of the contract.

[8] We assume, without deciding, that ORS 742.216 applies here, because defendant does not argue that it does not. *See Moore v. Mutual of Enumclaw Ins. Co.*, 317

■ Farmers' first point is that the mere fact that the house was rented increased the hazard. However, we have already concluded that the house is covered, be it owner-occupied or rented. Thus, even if ORS 742.216 is part of the contract, the rental alone does not void coverage.

■ Farmers' second point concerns the manner in which the house was rented. Specifically, Farmers points to the facts that defendant met with Pixler for only an hour in a donut shop, that he did not check Pixler's reference or do a credit check, and that he was paid $3,100 in cash, delivered in a shoe box. Farmers argues that the jury should have been allowed to consider whether defendant's conduct under those circumstances constituted an increase in hazard. We disagree. In *Patriotic Ins. Co. of America v. Franciscus*, 55 F2d 844 (8th Cir 1932), the court interpreted an insurance policy provision similar to ORS 742.216(1). There, the insured rented the premises to a third party who operated an illegal alcohol still that caused a fire and damaged the premises. The court said:

> "[T]he operation of an alcohol still in the insured premises was an increase of hazard. Whether it was brought about 'by means within the control or knowledge' of the insured is the question at issue. * * * [T]he overwhelming weight of authority is that the landlord is not an insurer against the introduction of the increased hazard, but that his liability depends upon his knowledge, or upon circumstances which, by the exercise of ordinary care and diligence, would result in such knowledge." 55 F2d at 847.

Similarly, in this case, the operation of an illegal methamphetamine lab is an increase in the hazard. However, there is no evidence from which the jury could find that defendant in fact knew of that hazard, or that by exercising ordinary care or diligence he should have known that someone other than Pixler would cook methamphetamine in the house. *Cf. Hahn v. Guardian Assurance Co.*, 23 Or 576, 32 P 683 (1893).[9]

---

Or 235, 855 P2d 626 (1993); *Molodyh v. Truck Ins. Exchange*, 304 Or 290, 293, 744 P2d 992 (1987).

[9] In *Hahn*, the court ruled that whether changing a building from a general merchandise store to a variety theater constituted an increase of fire hazard was a jury question. 23 Or at 581.

In its last two assignments, Farmers argues that the trial court erred in awarding defendant certain attorney fees. ORS 742.061 provides, in part:

"If settlement is not made within six months from the date proof of loss is filed with an insurer and an action is brought in any court of this state upon any policy of insurance of any kind or nature, and the plaintiff's recovery exceeds the amount of any tender made by the defendant in such action, a reasonable amount to be fixed by the court as attorney fees shall be taxed as part of the costs of the action and any appeal thereon."

■　Farmers first argues that, because ORS 742.061 allows attorney fees only if "an action is brought * * * upon" an insurance policy, defendant is not entitled to any fees incurred before the commencement of the declaratory judgment action. We disagree. Although ORS 742.061 provides for attorneys fees only when an action is brought on an insurance policy, it does not say, as Farmers argues, that any fees incurred before the commencement of the action are not recoverable even though they are reasonably related to the action. In light of the policy of ORS 742.061, which is to "encourage the settlement of the claims," *Northwest Marine Iron Works v. Western Cas. and Sur. Co.*, 45 Or App 269, 272, 608 P2d 199, *rev den* 289 Or 209 (1980), we conclude that attorney fees incurred before an action on an insurance policy is filed are recoverable, as long as they are reasonably related to the action itself. *Cf. Vancouver Furniture Co. v. Industrial Indem. Co. of Northwest*, 74 Or App 642, 648, 704 P2d 518 (1985), *rev den* 300 Or 477 (1986). In this case, the trial court found that the pre-litigation services rendered by defendant's counsel "undoubtedly assisted [counsel] in determining how to approach these facts and this case in preparation for the lawsuit." In light of that finding, we cannot say that the court abused its discretion in awarding defendant the portion of attorney fees incurred before Farmers commenced this action.

■　Farmers also argues that ORS 742.061 allows attorneys fees only on claims based on a "policy of insurance," and that the fees incurred on defendant's tort claim are not based on such a policy and, thus, are not recoverable. Defendant counters that the fees on his tort claim are recoverable, because that claim raises issues common to the contract

claim. *See Estate of Wesley E. Smith v. Ware*, 307 Or 478, 769 P2d 773 (1989); *Greb v. Murray*, 102 Or App 573, 795 P2d 1087 (1990). We need not decide that dispute, because defendant voluntarily reduced 28 hours as an apportionment of his counsel's time on the tort claim. Although defendant in his fee statement did not clearly allocate the fees to particular claims, the trial court held an evidentiary hearing, in which defendant's expert witness testified that the reduction was reasonable. The trial court accepted the reduction as a reasonable apportionment. Again, we cannot say that that was an abuse of discretion. *See Orendain v. Meyer Square Ltd.*, 97 Or App 608, 612, 776 P2d 1309, *rev den* 308 Or 593 (1989); *Creditors Protective Assoc. v. Britt*, 58 Or App 230, 235, 648 P2d 414 (1982); *cf. Nelson v. Emerald People's Utility Dist.*, 116 Or App 366, 377, 840 P2d 1384 (1992), *rev allowed* 316 Or 527 (1993); *Malot v. Hadley*, 102 Or App 336, 341, 794 P2d 833 (1990).

Affirmed.