Hinkle, J.
Plaintiffs challenge defendant’s refusal to pay, under an insurance policy it issued to plaintiffs, damages associated with the carbon-monoxide contamination of plaintiffs’ apartment building. Plaintiffs assert that defendant breached its contract and vio *42 lated G.L.c. 93Aand c. 176D. Both parties have moved for partial summary judgment. For the reasons set out below, plaintiffs’ motion is allowed in part and denied in part, and defendant’s motion is denied.
BACKGROUND
The following facts are undisputed unless otherwise noted. At all relevant times, plaintiffs Joseph and Alexander Matzner (“the Matzners”) owned an apartment building at 270 Clarendon Street, Boston (“the Building”), and were insured by a “Businessowners” insurance policy (“the Policy") issued by defendant SEACO Insurance Company (“SEACO”). The Policy’s “Businessowners Special Property Coverage Form” (“the Form”), on which the Matzners rely for coverage, states that:
We will pay for direct physical loss of or damage to Covered Property at the premises described in the Declarations caused by or resulting from any Covered Cause of Loss.
The Form defines “Covered Cause of Loss” as:
RISKS OF DIRECT PHYSICAL LOSS unless the loss is [excluded or limited in subsequent sections of the Form].
The Form does not define either the term “direct physical loss ... or damage” or the term “RISKS OF DIRECT PHYSICAL LOSS.”
In addition to explaining what is covered, the Form contains several relevant exclusions, discussed below as necessary.
The parties’ dispute over the scope of coverage arises from events beginning February 10,1995, when a tenant in Unit #4 of the Building called the Boston Fire Department because the unit’s carbon-monoxide detector had sounded. The Fire Department arrived, measured a high level of carbon monoxide,[2] and directed the tenants to leave the unit.[3] Mr. Matzner contacted his heating service, which in turn contacted a chimney-sweep service. Employees of both services came to the building and reviewed the condition of the building’s chimney. One or both concluded that the carbon monoxide buildup was due to “some sections of old round galvanized pipe” that had “wedged [their] way into the top of and were blocking the chimney. As of the filing of the summary-judgment motions, the parties had not discovered how the pipe found its way into the chimney.
The chimney-sweep service removed the piping; however, the alarm in Unit #4 sounded again the next day. The chimney-sweep service returned and cleaned and tested the chimney again. Consultations among the chimney-sweep service, a building inspector and the plaintiffs’ heating company yielded the suggestion that the chimney be lined and an exhaust fan installed on its top, both of which were done.
By telephone and by letter dated April 3, 1995, Mr. Matzner contacted the agent through whom he had purchased the Policy and requested reimbursement under the Policy for expenses associated with the carbon-monoxide contamination. By facsimile dated April 18, 1995, the agency transmitted Mr. Matzner’s letter to SEACO.
SEACO hired an adjuster to assess the merits of plaintiffs’ claim. The adjuster investigated the claim (meeting with Mr. Matzner, contacting the chimney-sweep service and possibly viewing the Building) and consulted with SEACO Senior Property Examiner Jack Warren. Ultimately, Warren directed the adjuster to deny the claim. By letter dated May 23, 1995, the adjuster notified Mr. Matzner of SEACO’s decision. The letter explains that coverage is precluded by the “Pollution" and the “Ordinance or Law” exclusions.
The Matzners in turn hired a different adjuster to re-evaluate their claim. By letter dated June 26, 1995, their adjuster requested that SEACO reverse its decision;[4] tire adjuster cited, among other things, two recent extrajurisdictional cases that he felt supported the Matzners’ position. By letter dated September 26, 1995, Warren notified the agency through whom the Matzners had purchased the Policy that, after review of the Matzners’ adjuster’s letter by SEACO’s counsel, SEACO had decided to maintain its position denying coverage.
Counsel for plaintiffs sent SEACO a letter dated December 6, 1995, demanding settlement of plaintiffs’ claim under G.L.c. 93A. The summaiy-judgment record includes a letter dated December 14, 1995, from SEACO’s counsel to plaintiffs’ counsel, responding to the demand letter and restating SEACO’s decision to deny coverage for the claim.[5] By letter dated April 3, 1996, plaintiffs’ counsel notified SEACO of additional expenses incurred by the Matzners and again demanded settlement under G.L.c. 93A. By letter dated May 1, 1996, SEACO declined to change its position.
DISCUSSION
I. Summary Judgment Standard
This Court grants summary judgment where there are no genuine issues of material fact and where the summary judgment record entitles the moving party to judgment as a matter of law. Cassesso v. Commissioner of Correction, 390 Mass. 419, 422 (1983); Community Nat'l Bank v. Dawes, 369 Mass. 550, 553 (1976); Mass.R.Civ.P. 56(c), 365 Mass. 824 (1974). The moving party bears the burden of affirmatively demonstrating the absence of a triable issue and that the summary judgment record entitles the moving party to judgment as a matter of law. Pederson v. Time, Inc., 404 Mass. 14, 16-17 (1989). Where, as here, both parties have moved for summary judgment, and “in essence there is no real dispute as to the salient facts or if only a question of law is involved,” summary judgment shall be granted to the party entitled to judgment as a matter of law. Cassesso, 390 Mass. at 422, quoting Community Nat’l Bank v. Dawes, supra.
*43 II. Coverage
A. Principles of Policy Interpretation
The interpretation of an insurance contract is generally a question of law. Cody v. Connecticut General Life Insurance Co., 387 Mass. 142, 146 (1982). Interpretation is governed by familiar rules of construction. “(W]hen construing language in an insurance policy, ‘[a court] consider[s] what an objectively reasonable insured, reading the relevant policy language, would expect to be covered.’ ” Western Alliance Ins. Co. v. Gill, 426 Mass. 115, 117 (1997), quoting Atlantic Mut. Ins. Co. v. McFadden, 413 Mass. 90, 92 (1992), quoting Hazen Paper Co. v. United States Fid. & Guar. Co., 407 Mass. 689, 700 (1990). If there is no ambiguity in the policy language, the Court “construe[s ] the words of the policy in their usual and ordinary sense,” Citation Ins. Co. v. Gomez, 426 Mass. 379, 381 (1998), quoting Hakim v. Massachusetts Insurers’ Insolvency Fund, 424 Mass. 275, 280 (1997), citing Cody, 387 Mass. at 146. “When the language of an insurance contract is ambiguous,” however, the Court “ interprets ] it in the way most favorable to the insured.” Citation Ins. Co., 426 Mass. at 381, citing Hakim, 424 Mass. at 281-82. “However, an ambiguity is not created simply because a controversy exists between the parties, each favoring an interpretation contrary to the other.” Citation Ins. Co., 426 Mass. at 381, quoting Lumbermens Mut. Cas. Co. v. Offices Unlimited, Inc., 419 Mass. 462, 466 (1995), citing Jefferson Ins. Co. v. Holyoke, 23 Mass.App.Ct. 472, 475 (1987). "A term is ambiguous only if it is susceptible of more than one meaning and reasonably intelligent persons would differ as to which meaning is the proper one.” Citation Ins. Co., 426 Mass. at 381, citing Jefferson Ins. Co., 23 Mass.App.Ct. at 474-75, citing Ober v. National Cas. Co., 318 Mass. 27, 30 (1945).
The parties disagree as to the proper scope of several terms and provisions of the Policy; I discuss each in turn.
B. “Direct Physical Loss or Damage”
Defendant claims that contamination of the Building by carbon monoxide does not constitute “direct physical loss or damage” within the meaning of the Policy. I find and rule that the phrase “direct physical loss or damage” is ambiguous in that it is susceptible of at least two different interpretations. One includes only tangible damage to the structure of insured property. The second includes a wider array of losses. Following the rule of construction that an ambiguous phrase be accorded the interpretation more favorable to the insured, I adopt the latter interpretation.
Although I have found no Massachusetts case that interprets the phrase “direct physical loss or damage,” courts in other jurisdictions have addressed that and similar phrases with differing results. I am persuaded by the reasoning of those cases that have construed the phrase “direct physical loss or damage” broadly, to include more than tangible damage to the structure of insured property.
In Western Fire Ins. Co. v. First Presbyterian Church, 165 Colo. 34 (1968), for example, the court considered a policy that insured against “direct physical loss” to property. The damage claimed was “the infiltration of gasoline in the soil under and around” a church, where the “gasoline and vapors thereof infiltrated and contaminated the foundation and halls and rooms of the . . . building, making [them] uninhabitable and making the use of the building dangerous.” Id. at 36-37. The court rejected the insurer’s argument that the insured had merely suffered a “loss of use” of the church not covered under the policy. On the contrary, according to the court, “this particular ‘loss of use’ was simply the consequential result of the fact that because of the accumulation of gasoline around and under the church building the premises became so infiltrated and saturated as to be uninhabitable, making further use of the building highly dangerous. All of which we hold equates to a direct physical loss within the meaning of that phrase as used by [the insurer in a policy similar to that here].” Id. at 39.
The adoption of this interpretation is in accord with the Massachusetts rule that ambiguous policy terms be interpreted in the manner most favorable to the insured. It also comports with the mandate that this Court “consider what an objectively reasonable insured . . . would expect to be covered.” Western Alliance Ins. Co. v. Gill, 426 Mass, at 117 (internal quotation marks omitted). See also, e.g., Sentinel Mgt. Co. v. New Hampshire Ins. Co., 563 N.W.2d 296 (Ct.App.Minn. 1997) (asbestos contamination constituted “direct physical loss”; court noted that “Direct physical loss also may exist in the absence of structural damage to the insured property,” citing to Western Fire Ins. Co. v. First Presbyterian Church, supra, and Hughes v. Potomac Ins. Co., 199 Cal.App.2d 239 (1962)); Farmers Insurance Co. of Or. v. Trutanich, 123 Or.App. 6, 10, 11 (1993) (concluding that “odor [from methamphetamine ‘cooking’] was ‘physical’ because it damaged the [insured property]” and that the cost of removing the odor was a “direct physical loss”).[6]
Thus, I find and rule that carbon-monoxide contamination constitutes “direct physical loss of or damage to” property, namely the insured Building, “caused by or resulting from any Covered Cause of Loss [i.e., by a ‘risk of direct physical loss’],” namely, the risk of carbon-monoxide contamination. Therefore, such contamination is covered by the Policy.
C.The Pollution Exclusion
As noted above, the Policy contains a number of exclusions to coverage. Defendant argues that the contamination in this case is excluded by the “Pollution Exclusion.” I disagree.
Like all the exclusions, this one is preceded by the following paragraph:
*44 We will not pay for loss or damage caused directly or indirectly by any of the following. Such loss or damage is excluded regardless of any other cause or event that contributes concurrently or in any sequence to the loss.
The Pollution Exclusion itself provides that:
We will not pay for loss or damage caused by or resulting from the discharge, dispersal, seepage, migration, release or escape of ‘pollutants’ unless the discharge, dispersal, seepage, migration, release or escape is itself caused by any of the ‘specified causes of loss’. But if loss or damage by the ‘specified causes of loss’ results, we will pay for the resulting damage caused by the ‘specified cause of loss’,
“Pollutants" are defined as:
any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed.
“Specified Causes of Loss” with exceptions not material here are defined as:
Fire; lightning: explosion, windstorm or hail; smoke; aircraft or vehicles; riot or civil commotion; vandalism; leakage from fire extinguishing equipment; sinkhole collapse; volcanic action; falling objects; weight of snow, ice or sleet; water damage.
Defendant contends that carbon monoxide is a “pollutant,” and therefore that the Pollution Exclusion excludes carbon monoxide contamination from coverage.
The Massachusetts appellate courts have not resolved the precise issue of whether a property insurance policy with the language at issue here covers carbon-monoxide contamination. However, two Massachusetts cases interpreting liability policies with pollution exclusions nearly identical to that in this case have concluded that such exclusions do not operate to exclude damage caused by contaminants.
In Atlantic Mut. Ins. Co. v. McFadden, 413 Mass. 90 (1992), the Supreme Judicial Court held that a pollution exclusion[7] in a comprehensive general liability policy did not operate to exclude coverage for lead-contaminated paint in a residential property owned by the insureds. The Court considered what an insured could “reasonably have understood” the exclusion to mean, and concluded that such an insured:
could have understood the provision at issue to exclude coverage for injury caused by certain forms of industrial pollution, but not coverage for injury allegedly caused by the presence of leaded materials in a private residence. Id. at 92, citing West Am. Ins. Co. v. Tufco Flooring East, 104 N.C.App. 312, 321-26 (1991), noting that West Am Ins. Co. construed substantially the same exclusion.
The Court noted that there was “simply ... no language in the exclusion . .. from which to infer that the provision was drafted with a view toward limiting liability for lead paint-related injury.” Id. at 92. Rather, according to the Court, the terms in the exclusion (the Court listed “discharge,” “dispersal,” “release,” and “escape”) were ’’terms of art in environmental law which generally are used with reference to damage or injury caused by improper disposal or containment of hazardous waste." Id. at 92, citing West Am Ins. Co., 104 N.C.App. at 324. Thus, the Court concluded that the pollution exclusion in that case did not exclude coverage for lead-contaminated paint in a residence.
The Supreme Judicial Court recently reaffirmed this understanding of that pollution exclusion. In Western Alliance Ins. Co. v. Gill, supra, the Court held that a virtually identical pollution exclusion in a general liability policy covering a restaurant did not operate to exclude personal injuries caused by a patron’s exposure to carbon-monoxide fumes in the restaurant.[8] The Court held that although Atlantic Mut. Ins. Co. v. McFadden, supra, involved a different sort of contamination and considered a policy applicable to a residence as opposed to a business, its reasoning applied equally well to Western Alliance Ins. Co. The Court relied particularly on the distinction drawn in the earlier case between industrial and other contaminants and on the notion that an “objectively reasonable insured . . . would not expect a disclaimer of coverage” for “injuries resulting from everyday activities [as opposed to industrial ones] gone slightly, but not surprisingly, awry, Western Alliance Ins. Co., 426 Mass. at 119, 120, quoting Pipefitters Welfare Educ. Fund v. Westchester Fire Ins. Co., 976 F.2d 1037, 1044 (7th Cir. 1992). As support for its holding that the exclusion was limited to industrial pollution, the Court referred to an extrajurisdictional case that ”not[ed] that the history of the . .. exclusion indicates that the provision was drafted to avoid enormous expense of environmental litigation" and concluded that “ ‘[w]e would be remiss, therefore, if we were to simply look to the bare words of the exclusion, ignore its raison d'etre, and apply it to situations which do not remotely resemble traditional environmental contamination.’ ” Western Alliance Ins. Co., 426 Mass. at 118, citing and quoting American States Ins. Co. v. Koloms, Ill.2d (Oct. 17, 1997), slip op. at 16.
The reasoning of Atlantic Mut. Ins. Co. v. McFadden, supra, and Western Alliance Ins. Co. v. Singh, supra, applies equally to the facts of this case.[9] SEACO disagrees, arguing that this case should be distinguished because it involves a property insurance policy, which covers a narrower range of situations than the general liability policies in earlier cases. Concededly, the reasoning in Western Alliance Ins. Co. mentions the type of policy at issue there and the expectations that an reasonable purchaser of such a policy would have:
*45 The insureds purchased the general liability policy to protect against potential premises and operations hazards that could arise while conducting a restaurant business. A reasonable insured would not expect a pollution exclusion to abrogate this coverage. Id. at 120-21 (emphasis supplied; footnote omitted).
I find, however, that the insureds in the case before me likely purchased their Policy for the same reason as the insureds in Western Alliance Ins. Co.: “to protect against potential premises... hazards that could arise while conducting a . . . business” (in the Matzners’ case, the business of leasing out residential rental units). Therefore, I conclude that reasonable insureds in the Matzners’ position “would not expect a pollution exclusion to abrogate this coverage.” In addition, I find that an objectively reasonable insured would not expect a disclaimer of coverage for carbon-monoxide contamination, where there is no indication that the contamination resulted from industrial operations as opposed to some “everyday activitly] gone slightly, but not surprisingly, awry,” Western Alliance Ins. Co., 426 Mass. at 120.[10] In sum, the reasoning in Western Alliance Ins. Co. and Atlantic Mut. Ins. Co. applies to the facts before me and leads me to rule that the Pollution Exclusion in the Matzners’ Policy does not exclude coverage for carbon-monoxide contamination. [11]
D. The Negligent Work Exclusion
SEACO also argues that the contamination in this case falls within the Policy’s “Negligent Work Exclusion,” which excludes coverage for loss or damage resulting from:
Faulty, inadequate or defective:
(1) Planning, zoning, development, surveying, siting:
(2) Design, specifications, workmanship, repair, construction, renovation, remodeling, grading, compaction;
(3) Materials used in repair, construction, renovation or remodeling; or
(4) Maintenance;
of part or all of any property on or off the described premises.
SEACO theorizes that negligent construction or maintenance of the chimney might have caused the contamination in this case, so that the contamination would fall within this exclusion. Because SEACO, which has the burden of proving the applicability of this exclusion (see footnote 10, supra), has provided no evidence that this was the case, I conclude that the Matzners’ motion for summary judgment must be allowed insofar as it contends that this exclusion does not apply.
E. The Ordinance or Law Exclusion
SEACO also contends that the contamination falls within the Policy’s “Ordinance or Law Exclusion,” which excludes coverage for loss or damage resulting from:
The enforcement of any ordinance or law:
(1) Regulating the construction, use or repair of any property; or
(2) Requiring the tearing down of any property, including the cost of removing its debris.
SEACO argues that the Fire Department’s order or recommendation that the tenants of Unit # 4 leave the unit because of the contamination represents the enforcement of an ordinance or law, and thus that the contamination (or at least any expenses related to the tenants’ vacation of the unit) falls within the exclusion. Again, because SEACO, which has the burden of proving the applicability of this exclusion (see footnote 10, supra), has provided no evidence that the Fire Department was enforcing a particular law or ordinance, I conclude that the plaintiffs’ motion for summary judgment must be allowed insofar as it asserts that this exclusion does not apply.[12]
III. Claims Under G.L.c. 93A and c. 176D
Plaintiffs also allege that by denying coverage (and, according to plaintiffs, by failing to conduct a reasonable investigation of their claim), SEACO violated G.L.c. 93A and c. 176D. Plaintiffs have moved for summary judgment on those claims. I find and rule that the record before me contains insufficient evidence to determine whether defendant’s conduct was such as to violate those statutes: specifically, there are genuine issues of material fact as to whether SEACO (1) committed “unfair or deceptive acts or practices” (in violation of G.L.c. 93A, §2(a)); (2) rejected the Matzners’ claim “without conducting a reasonable investigation” (in violation of G.L.c. 176D §3(9)(d)); (3) “[m]isrepresent[ed] pertinent facts or insurance policy provisions relating to coverages at issue” (in violation of G.L.c. 176D, §3(9)(a)); or (4) “[c]ompell[ed] [the] insureds to institute litigation to recover amounts due under an insurance policy by offering substantially less than the amounts ultimately recovered in actions brought by such insureds" (in violation of G.L.c. 176D, §3(9) (g)), as the Matzners allege. Therefore, plaintiffs’ motion for summary judgment on those claims is denied.
ORDER
For the reasons set out above, it is ORDERED that plaintiffs’ motion for partial summary judgment is ALLOWED as to Count I and DENIED as to Count II, and defendant’s cross-motion is DENIED in its entirety.

Although defendant does not expressly dispute the fact that the Fire Department confirmed that the unit contained an unacceptably high level of carbon monoxide, the summary-judgment record indicates that SEACO personnel had doubts about, or at least considered raising the issue of the accuracy of the tenants’ detector.

 The summary-judgment record reveals some dispute as to whether the Fire Department ordered the tenants to leave or merely recommended they do so. This dispute presumably relates to the parties’ respective views as to whether the damage in this case should be excluded under the Policy’s “Enforcement or Law” exclusion: i.e., defendant prefers a scenario in which the Fire Department required the tenants to leave, because this might suggest that plaintiffs’ damages were caused by “the enforcement of [an] ordinance or law,” whereas plaintiffs prefer a scenario in which the Fire Department recommended that the tenants leave, as this might suggest that no such enforcement took place. I find the distinction to be immaterial.

The summary judgment record does not contain a copy of the actual June 26, 1995, letter, but rather a copy of aletter of that date marked “DRAFT COPY.” A memo from SEACO’s adjuster to Warren referring to the June 26, 1995, letter it received from plaintiffs’ adjuster indicates that the letter actually sent was most likely quite similar to the draft version in the summary-judgment record.

his response was misaddressed (to “29" rather than "92 State Street”) and the Matzners claim that they did not receive it until much later. The Matzners’ original complaint, filed January 29, 1996, alleges that SEACO never responded to their counsel's demand letter, while their Amended Complaint (dated April 10, 1996) acknowledges that it did. I infer, therefore, that the Matzners received SEACO’s response at some point between the filing of their original Complaint and the date of their Amended Complaint.

But see Pirie v. Federal Ins. Co., 45 Mass.App.Ct. 907, 907, 908 (1998) (in homeowner’s property insurance policy, “physical loss" did not include costs of removing lead paint from insured premises; court relied on principle that “an internal defect in a building . . . does not rise to the level of a physical loss,” especially where policy “also contain[ed] numerous references to specific types of physical damage which [were] covered,” citing for articulation of this principle to HRG Dev. Corp. v. Graphic Arts Mut. Ins. Co., 26 Mass.App.Ct. 374 (1988), described below; also citing to Great Northern Ins. Co. v. Benjamin Franklin Fed. Savings & Loan Assoc., 793 F.Supp. 259, 263 (D.Or. 1990), aff'd, 953 F.2d 1387 (9th Cir. 1992), described below); HRG Dev. Corp. v. Graphic Arts Mut. Ins. Co., supra at 374, 375, 377 (policy’s insurance of heavy machinery “against all risks of physical loss or damage from any external cause” did not cover losses due to defect in insured’s title; court noted that it did not “think the salient phrase (’physical loss or damage’) fairly [could] be construed to mean physical loss in the absence of physical damage” (emphasis in original); court noted in support of this conclusion that “In every listed exception [to coverage], save one, the ’loss[es] or damage[s]’ set forth are essentially of a physical nature. In addition, two of the ‘special conditions' of the policy tend to reinforce our view that the policy was intended to cover physical losses and damage” (emphasis in original; footnotes omitted)); American Home Assur. v. Libbey-Owens-Ford Co., 786 F.2d 22, 25 (1st Cir. 1986) (deciding case on other grounds, but stating: 'The [trial] court noted that although a number of courts have held that intangible losses, such as loss of use or diminution of value, are ‘property damage’, . . . all such decisions had interpreted policy language defining property damage as ‘injury to tangible property’ rather than ‘physicalinjury to tangible property.’ In cases in which courts have interpreted more recent policies in which property damage is defined as ‘physical’ injury to tangible property, such courts have held that intangible damages, such as diminution in value, are not considered property damage” (emphasis in original), citing Wyoming Sawmills v. Transportation Ins. Co., 282 Or. 401 (1978); Federated Mut. Ins. Co. v. Concrete Units, Inc., 363 N.W. 751, 757 (Minn. 1985)); Ranger Ins. Co. v. Globe Seed & Feed Co., Inc., 125 Or.App. 321, 324, 332 (1993) (where insurance policy excluded “damage to or destruction of the property of any person,” court held that “infestation of weeds” (that insured’s customer was compelled to eradicate) was not excluded because it was not “property damage”: “An infestation of weeds . . . does not damage anything. ... [T]he cost of removing weeds is not a loss that is the consequence of damage to the soil or to any other property.”); Great Northern Ins. Co. v. Benjamin Franklin Fed. Savings & Loan Assoc., supra at 261, 263 (cited in Pirie v. Federal Ins. Co., supra) (where property insurance policy covered any loss resulting ’’from a direct physical loss or damage by a Covered Cause of Loss" [le., by “direct physical loss or damage,” subject to certain exclusions), asbestos contamination was not a “direct physical loss,” where the insured “building ha[d] remained physically intact and undamaged”); Wyoming Sawmills v. Transportation Ins. Co., supra at 403, 404, 406 (where policy covered "physical injury to or destruction of tangible property,” and certain studs manufactured by insured and installed in third party’s building had “warped, twisted, or were otherwise defective,” thereby lowering value of building (but not affecting building’s structure), court held that policy did not cover labor expenses for removal and replacement of studs; court reasoned that the adjective “physical" indicated that policy did not intend to include “ ‘consequential or intangible damage,’ such as depreciation in value, within the term ‘property damage.’ The intention to exclude such coverage can be the only reason for the addition of the word [’physical’]’’ (footnote omitted).).

The Atlantic Mut. Ins. Co. exclusion applied to:
“bodily injury or property damage arising out of the actual, alleged or threatened discharge, [dispersal], release or escape of pollutants . . .” Id. at 95 (Appendix) (quoting insureds’ quotation from policy).
“Pollutants” were defined as:
“any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and wastes. Waste includes materials to be recycled, reconditioned or reclaimed.” Id. at 96 (Appendix) (quoting insureds’ quotation from policy).

The exclusion in the Western Alliance Ins. Co. case applied:
‘to bodily injury or property damage arising out of the actual, alleged or threatened discharge, dispersal, release or escape of pollutants.’ Western Alliance Ins. Co., 426 Mass, at 116 n.4.
“Pollutants” were defined as:
‘any solid, liquid, gaseous or thermal irritant or contaminant including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Water includes materials to be recycled, reconditioned or reclaimed.’ Id. at 117 n.4.

In addition to relying on these cases, plaintiffs make the following argument: (1) carbon monoxide can be characterized as “smoke”; (2) the Policy is ambiguous as to whether smoke is covered (on the one hand, as a “pollutant,” it is excluded; on the other hand, as a “specified cause of loss,” it may trigger coverage for damage associated with pollutants); and (3) therefore, rules of construction mandate that the Policy be interpreted in plaintiffs’ favor to cover carbon monoxide “smoke.” Defendants oppose this argument, contending that carbon monoxide is not “smoke.” Because I find in favor of plaintiffs on other grounds, I do not consider this argument.

There is no evidence on the record as to the cause of the contamination. However, where, as here, an exclusion appears in a separate paragraph of the Policy from the clause defining what is covered, SEACO as the insurer has the burden of showing that the exclusion applies. Highlands Ins. Co. v. Aerovox Inc., 424 Mass. 226, 232 n.8 (“determining which party bears the burden of proving an exclusion is dependent on the location of the exclusion in the insurance policy: where the exclusion is in the same paragraph as the *47 coverage clause, the exclusion is considered part of the coverage clause for purposes of burden of proof, but where the exclusion is in a separate and distinct part of the insurance policy, the exclusion is treated separately from the coverage clause and the burden shifts to the insurer” (citations omitted)). Where there is no evidence that negligent work caused the contamination, I find and rule that SEACO would be unlikely to be able to provide such evidence at trial. Therefore, plaintiffs are entitled to summary judgment on issue of whether the contamination was industrial. See Flesner v. Technical Communications Corp., 410 Mass. 805, 809 (1991); Kourouvacilis v. General Motors Corp., 410 Mass. 706, 716 (1991).

In opposing this conclusion, SEACO relies in part on U.S. Liab. Ins. Co. v. Bourbeau, 49 F.3d 786 (1st Cir. 1995). In that case, the Court of Appeals held that under Massachusetts law a pollution exclusion to a comprehensive liability policy did exclude from coverage soil contamination caused by lead paint chips scattered by a contractor while stripping and painting a building. The Court distinguished Atlantic Mut. Ins. Co. on three grounds: (1) Bourbeau was an “environmental pollution” case, unlike Atlantic Mut. Ins. Co.; (2) Bourbeau concerned property damage, whereas Atlantic Mut Ins. Co. concerned personal injury; and (3) Bourbeau concerned the discharge of paint onto property, whereas Atlantic Mut. Ins. Co. concerned the presence of lead paint in a household. Bourbeau, 49 F.3d at 789. To the extent that Bourbeau is inconsistent with my conclusion, I decline to follow it. However, I note that Bourbeau's conclusion is not inconsistent with mine. First, the case before me, unlike Bourbeau, does not appear to concern “environmental pollution.” Second, the Western Mut Ins. Co. case demonstrated that the Supreme Judicial Court does not consider the distinction between property damage and personal injuiy to be dispositive of the application of a pollution exclusion. Third, it is unclear that the case before me involves a contaminant’s “discharge onto property" as opposed to “presence in a residence,” which Bourbeau found important.

As an alternative ground for my conclusion, I agree with the reasoning of Sentinel Mgt. Co. v. New Hampshire Ins. Co., 563 N.W.2d 296 (Ct. App. Minn. 1997). The court in that case rejected an insurer’s assertion of an “ordinance or law” exclusion, holding that ”[s]o long as extraneous forces cause physical damage to property, this type of exclusion does not defeat recovery when, as a result, a governmental body enforces an ordinance against the property.” Id. at 302 (citations omitted). "(The insured’s] loss is ... contamination,” the court reasoned; “that [the insured] might one day be required by law to remove the (contamination] does not change the nature of its existing loss into one caused by enforcement of an ordinance.” Id.
I note as well that if an insurer could disclaim coverage whenever an instance of physical damage implicated the requirements of some law or ordinance, a typical insurance policy would cover far fewer losses than, in my judgment, an objectively reasonable insured would expect.