# United States Court of Appeals
## For the First Circuit

No. 06-2750

ESSEX INSURANCE COMPANY,

Plaintiff, Appellee,

v.

BLOOMSOUTH FLOORING CORPORATION,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Leo T. Sorokin, U.S. Magistrate Judge]

Before

Lipez, Selya and Howard,
Circuit Judges.

Steven L. Schreckinger, with whom Harvey Nosowitz, and Lynch, Brewer, Hoffman & Fink, LLP, were on brief for appellant.
Robert L. Ciociola, with whom Litchfield Cavo, LLP was on brief, for appellee.

April 16, 2009

**HOWARD**, <u>Circuit Judge</u>. This appeal involves a coverage dispute between Essex Insurance Company and its insured, BloomSouth Flooring Corporation. Essex brought a declaratory judgment action claiming that, pursuant to "business risk exclusions" in its policies, it had neither a duty to defend nor a duty to indemnify BloomSouth in connection with an underlying state court action against BloomSouth. The magistrate judge, presiding by mutual consent, <u>see</u> 28 U.S.C. § 636(c), granted Essex's motion for summary judgment, finding that the pertinent exclusions relieved Essex of both its duties to defend and to indemnify. On appeal, BloomSouth targets only the duty to defend.

Because the exclusions, as applied to the underlying complaint, do not relieve Essex of its duty to defend, we reverse the district court's summary judgment ruling in pertinent part.

## I. Background

We recite the facts in the light most favorable to BloomSouth, the party against whom summary judgment was granted. <u>See</u> <u>Millipore Corp.</u> v. <u>Travelers Indem. Co.</u>, 115 F.3d 21, 25 (1st Cir. 2006).

In 2000, Boston Financial Data Services ("BFDS") retained Suffolk Construction Corporation as general contractor for a tenant improvement project at its offices in Massachusetts. In undertaking the project, Suffolk subcontracted with BloomSouth for the installation of carpet tile and related materials throughout

-2-

the building.  The subcontract required BloomSouth to perform minor preparation work before laying the carpet.  This work included testing and cleaning the concrete floor.  BloomSouth itself subcontracted out the installation to two other companies.  One was charged with supplying the carpet and the other with installing it.

During all material times BloomSouth had commercial general liability policies with Essex.  The general contractor Suffolk was an additional insured on the Essex policies that were issued to BloomSouth.  BloomSouth's subcontract also required it to defend and indemnify Suffolk for claims against Suffolk arising out of BloomSouth's work.  Coverage under a first policy began on July 15, 2000 and extended through July 15, 2001; coverage under a second policy began on July 15, 2001 and extended through July 15, 2002.

Both policies specifically covered, among other types of damage, liability for "property damage" that occurred in the coverage territory and during the policy period.  The policies define property damage as both "[p]hysical injury to tangible property, including all resulting loss of use of that property," and "[l]oss of use of tangible property that is not physically injured."  Both policies also contain a number of what are commonly referred to as "business risk exclusions" that serve to deny coverage for certain types of claims that relate directly to the insured's faulty workmanship, as opposed to damage caused to a

third party.  In turn, many of these exclusions contain exceptions that, if operable, will restore coverage to the insured.

In late April or early May 2001, the carpet was installed.  Although it is unclear exactly when BFDS employees moved into the building, after moving in they noticed an odor.  The employees described the odor as a "locker room" smell, a "playdough" smell, or a "sour chemical" smell.  Some further complained that the odor caused headaches or other ill effects.

BFDS notified Suffolk of the offensive odor.  In an effort to eliminate the odor, one of BloomSouth's subcontractors scraped up the original carpet adhesive and re-carpeted the floor.  That effort failed to correct the problem and the odor spread to other areas of the building.  As a result, the subcontractor and Suffolk conducted tests of the carpet, the floor, and the air in the building.  Test results were inconclusive.  The subcontractor blamed the smell on a chemical reaction between the carpet and the concrete floor, and Suffolk claimed that the subcontractor had installed defective carpet, causing the odor.  BFDS presented a claim of property damage to Suffolk and demanded that Suffolk remove the carpet and eliminate the smell.  Suffolk subsequently requested that BloomSouth respond to BFDS's claim.  BloomSouth refused, and as a result, Suffolk paid BFDS $1,417,500.00 for remediation efforts.  During the remediation process, Suffolk, pursuant to its status as an additional insured under BloomSouth's

-4-

policy with Essex, notified Essex of BFDS's claim and demanded that Essex defend and indemnify Suffolk. In April 2002, Essex disclaimed coverage to Suffolk for BFDS's claim.

In due course, Suffolk sued BloomSouth in state court. Suffolk asserted claims for negligence, contractual indemnity, breach of the implied warranty of merchantability, breach of express warranty, breach of contract, and contribution under M.G.L. ch. 231B. Suffolk's complaint alleged that: (1) BloomSouth was responsible for negligently and defectively providing and installing carpet "resulting in damage to and loss of use of the building, including an alleged unwanted odor which permeated the building," and (2) BloomSouth's negligent and defective work caused Suffolk to spend money in an attempt to eliminate the alleged odor. Money was spent on, among other things, "the installation of carbon air filters to the ventilation system in the building," and "removal of the existing carpet tile and adhesives, bead-blasting of the concrete floor and replacement of the carpet tile and related materials."

Shortly after Suffolk filed its action against BloomSouth in state court, Essex filed a diversity action in the District of Massachusetts, seeking a declaratory judgment against BloomSouth and Suffolk. Essex sought a declaration that, under the insurance policies issued to BloomSouth, it was not required to defend or indemnify either Suffolk or BloomSouth for the claims being

-5-

asserted in Suffolk's state court action or for the claims asserted by BFDS against Suffolk. Essex specifically claimed that various business risk exclusions relieved it of any duty to provide defense or indemnity. BloomSouth and Suffolk filed counterclaims seeking a declaration that Essex was required to defend and indemnify them.

After consenting to the jurisdiction of a magistrate judge, the parties agreed to conduct discovery jointly with the discovery in Suffolk's underlying state court action against BloomSouth. After the completion of discovery, all parties moved for summary judgment in the federal court action.

The court granted Essex's motion for summary judgment. Although the court appeared to assume that Suffolk alleged property damage sufficient to give rise to coverage, it concluded that business risk exclusions labeled (m) and (k) relieved Essex of its policy obligations. Exclusion (m) barred coverage for property damage to "impaired property," defined as property that has not been physically injured. The court held that this exclusion barred coverage for Suffolk's allegation that an unwanted odor permeated the building because it was an allegation of damage to "impaired property." Exclusion (k) excluded coverage for property damage to the insured's own product, and the court determined that this exclusion applied to Suffolk's allegation that the concrete floor had to be bead-blasted prior to the installation of replacement carpet. The court arrived at this conclusion by reasoning that

during the original installation process the concrete floor had essentially become BloomSouth's product. Finding that these exclusions effectively encompassed "all of the contingencies presented in [Suffolk's] complaint" the court concluded that Essex had no duty to defend or indemnify BloomSouth or Suffolk. BloomSouth appeals from the final judgment of the court.

## II. Discussion

We review de novo a court's grant of summary judgment. Bogan v. City of Boston, 489 F.3d 417, 424 (1st Cir. 2007). Because this is a diversity case, Massachusetts substantive law controls. B & T Masonry Constr. Co. v. Pub. Serv. Mut. Ins. Co., 382 F.3d 36, 38 (1st Cir. 2004). Under Massachusetts law, the interpretation of an insurance policy is normally a question of law for the court. Ruggerio Ambulance Serv. v. National Grange Ins. Co., 724 N.E.2d 295, 298 (Mass. 2000). Summary judgment for an insurance company is proper "when the allegations in the underlying complaint lie expressly outside the policy coverage and its purpose." Herbert A. Sullivan, Inc. v. Utica Mut. Ins. Co., 788 N.E.2d 522, 531 (Mass. 2003) (quotation omitted). The critical issue is whether the summary judgment record alleges a liability arising on the face of the complaint and the policy. Id. at 530 (quotation omitted).

The law regarding an insurer's duty to defend is well-settled in Massachusetts. HDH Corp. v. Atl. Charter Ins. Co., 681

-7-

N.E.2d 847, 850 (Mass. 1997). The duty to defend is broader than the duty to indemnify. Herbert A. Sullivan, Inc., 788 N.E.2d at 531. In order to determine whether an insurer has a duty to defend, a comparison must be made of the facts alleged in the underlying complaint with the insurance policy provisions. Id. "If the allegations of the complaint are 'reasonably susceptible' of an interpretation that they state or adumbrate[1] a claim covered by the policy terms, the insurer has a duty to defend." Mt. Airy Ins. Co. v. Greenbaum, 127 F.3d 15, 19 (1st Cir. 1997) (noting duty to defend may be triggered even if the allegations of the underlying complaint are baseless); see also Cont'l Casualty Co. v. Gilbane Bldg. Co., 461 N.E.2d 209, 212 (Mass. 1984). In sum, "The obligation of an insurer to defend is not, and cannot be, determined by reference to the facts proven at trial. Rather, the duty to defend is based on the facts alleged in the complaint and those facts which are known by the insurer." Boston Symphony Orchestra, Inc. v. Commercial Union Ins. Co., 545 N.E.2d 1156, 1158-59 (Mass. 1989)(citing Desrosiers v. Royal Ins. Co., 468 N.E.2d 625, 627-28 (Mass. 1984)). "[I]nformation derived from outside the complaint may not serve to negate the duty to defend."

---

[1] We have defined "adumbrate" in the liability insurance context to mean "to give a sketchy representation of; outline broadly, omitting details . . . or to suggest, indicate or disclose partially and with a purposeful avoidance of precision." Global Naps v. Fed. Ins. Co., 336 F.3d 59, 61 n.2 (1st Cir. 2003)(internal quotation omitted).

Metallized Prods. Inc. v. Travelers Ins. Co., 2003 WL 22481398 at *3 (Mass. Super. Ct. Sept. 17, 2003)(citing Millipore, 115 F.3d at 35-36).

Determining the existence vel non of the duty to defend requires a court to consider "what kind of losses may be proved as lying within the range of the allegations of the complaint, and then see whether any such loss fits the expectation of protective insurance reasonably generated by the terms of the policy." Open Software Found., Inc. v. U.S. Fid. & Guar. Co., 307 F.3d 11, 16 (1st Cir. 2002); see also Sterilite Corp. v. Cont'l Casualty Co., 458 N.E.2d 338, 341 (Mass. App. Ct. 1983). Put differently, we ask "what an objectively reasonable insured, reading the relevant policy language, would expect to be covered." Hazen Paper Co. v. United States Fid. & Guar. Co., 555 N.E.2d 576, 583 (Mass. 1990).

The insured initially bears the burden of showing that the allegations in the underlying complaint fit within the covered risks in the policy. Highlands Ins. Co. v. Aerovox Inc., 676 N.E.2d 801, 804 (Mass. 1997). Once the insured has satisfied this burden, it falls to the insurer "to prove the applicability of one or more separate and distinct exclusionary provisions." B & T Masonry Constr. Co., 382 F.3d at 39 (citing Highlands Ins. Co., 676 N.E.2d at 804). Both determinations -- whether an allegation creates the possibility of a covered claim, and whether an exclusion applies to relieve an insurer of its duty to defend --

depend on whether the insured would have reasonably understood the exclusion to bar coverage. See Atlantic Mut. Ins. Co. v. McFadden, 595 N.E.2d 762, 764 (Mass. 1992).

As previously noted, the district court implicitly assumed that BloomSouth had met its initial burden of showing that the underlying complaint alleged "physical injury to tangible property" within the meaning of the policy. On appeal, the parties do not address directly the issue of whether there was physical injury to tangible property. Rather, they address the issue only in the context of the "impaired property" exclusion (m). As this is a threshold issue, we confront it at the outset, after which we analyze whether Essex can show that exclusions nonetheless serve to relieve it of the duty to defend.

BloomSouth argues that two of the underlying allegations are reasonably susceptible to the interpretation that they assert claims of "physical injury." These allegations are: (1) that an unwanted odor permeated the building, and (2) that the concrete floor in the building required "bead-blasting." We agree.

### A. Allegation of a permeating odor

The Massachusetts Supreme Judicial Court has not determined whether the presence of a permeating odor may constitute "physical injury." Accordingly, we make "an informed prophecy of what the court would do" if confronted with the question. Trans-Spec Truck Serv. v. Caterpillar Inc., 524 F.3d 315, 323 (1st Cir.),

-10-

cert. denied, 129 S. Ct. 500 (2008). "In making such a prophecy, we look to analogous cases decided by other courts in the forum state, persuasive reasoning in cases from other states, and learned treatises." Id.; see also Andrew Robinson Int'l, Inc. v. Hartford Fire Ins. Co., 547 F.3d 48, 51-52 (1st Cir. 2008).

The parties have identified two cases, albeit unpublished, from Massachusetts lower courts that support a finding that the presence of odor in a building can constitute "physical injury" to the building. In Matzner v. Seaco Ins. Co., 1998 WL 566658 (Mass. Super. Ct. Aug. 12, 1998), the insureds claimed that carbon-monoxide contaminated their apartment building, entitling them to coverage under an insurance policy that protected against direct physical loss or damage to property. The court first noted that the phrase "direct physical loss" was ambiguous[2] and that it should therefore be "interpreted in the manner most favorable to the insured." Id. at *11. Accordingly, the court ruled that "carbon monoxide contamination constitutes a 'direct physical loss of or damage to' property." Id. at * 13. It is important to note that Matzner was a first-party claim, and thus the duty to defend was not at issue. Given that the salient question before us involves the lesser burden of determining whether the underlying

---

[2]  "The phrase 'direct physical loss or damage' . . . is susceptible of at least two different interpretations. One includes only tangible damage to the structure of insured property. The second includes a wider array of losses." Matzner, 1998 WL 566658, at *3.

-11-

complaint is "reasonably susceptible" of stating a covered claim, Mt. Airy Ins. Co., 127 F.3d at 19, we need not resolve the ambiguity issue to conclude that the complaint can be so read.

In Arbeiter v. Cambridge Mut. Fire Ins. Co., 1996 WL 1250616 (Mass. Super. Ct. March 15, 1996), the insureds claimed that the presence of oil fumes in their home constituted a "physical loss" to the building triggering insurance coverage. The court, in partially denying summary judgment for the insurer, was persuaded by the plaintiffs' argument "that fumes are a physical loss which attach to the property." Id. at * 3.

The two Massachusetts cases, Arbeiter and Matzner, relied on cases from other jurisdictions to support their conclusions. In Farmers Ins. Co. of Or. v. Trutanich, 858 P.2d 1332 (Or. Ct. App. 1993), upon which Arbeiter relied without further discussion, the Oregon Court of Appeals held for an insured who claimed that methamphetamine odors had physically injured his home. The court found that the "pervasive" odors were "physical" because they "infiltrated" the house and that such damage qualified as a physical loss under the terms of his insurance policy. Id. at 1335-36. Similarly, in W. Fire Ins. Co. v. First Presbyterian Church, 437 P.2d 52 (Colo. 1968), the Supreme Court of Colorado upheld coverage where an insured argued that gasoline vapors physically damaged the property because they contaminated the foundation, halls, and rooms of a building. The court dismissed

the concept that physical damage could only occur if "some tangible injury to the physical structure itself could be detected," noting, "[c]ommon sense requires that a policy should not be so interpreted in the absence of a provision specifically limiting coverage in this manner." Id. at 56 (citation omitted).

Essex makes three arguments in response. First, it argues that the underlying claim does not reference injury to "tangible" property, but instead alleges that the odors injured the "air." Second, Essex asserts that an odor cannot constitute "physical injury" to property. Finally, Essex says that, even if there is an allegation of injury to tangible property, and even if odors can constitute physical injury to property, the complaint still would not trigger the duty to defend because the cases suggest that the odor must have "persisted in and permeated the structural components of the properties after their original source was removed" to be considered physical injury to property. Essex claims that the odor here does not qualify because once the carpet was removed "there was no persistent odor remaining."

We reject each argument. First, Essex reads too much into Suffolk's complaint when it states that Suffolk alleged -- and BFDS claimed -- that odors only permeated the building's "air." Suffolk in fact alleged that an unwanted odor "permeated the building" (emphasis added). Such an allegation may be reasonably construed as claiming damage to property.

Second, Essex does not provide any authority in support of its contention that odor cannot constitute physical injury to property. Given Arbeiter, Matzner, and the cases upon which they rely, the appellant has met its initial burden on this issue.

Third and finally, although Essex may be correct that odor can only constitute physical injury to property if it is permeating or pervasive, nothing in the complaint (the controlling document in the duty to defend inquiry) indicates that the odor was not pervasive or permeating. On the contrary, the underlying complaint explicitly asserts that the odor "permeated the building" and that Suffolk expended funds "to remediate the alleged odor."

Essex claims that the odor was not pervasive or permeating because, when the carpet was removed, "the smell went out with the [carpet]." That claim, however, impermissibly relies on extrinsic evidence, which Massachusetts law proscribes.[3] See Sterilite Corp., 458 N.E.2d at 344 ("What is not permitted is that an insurer shall escape its duty to defend the insured against a liability arising on the face of the complaint and policy, by dint of its own assertion that there is no coverage in fact . . . ."); Nashua Corp. v. Liberty Mut. Ins. Co., 1997 WL 89163, at *3 (Mass. Super. Ct. Feb. 18, 1997) ("[W]here a complaint is susceptible on its face of a reading that brings the claim within the policy, the

_____

[3] The factual bases for much of Essex's argument comes from discovery conducted in both this case and the underlying case.

-14-

insurer cannot rely on facts outside the complaint to justify a unilateral refusal to defend").

Against this legal and factual backdrop, we are persuaded both that odor can constitute physical injury to property under Massachusetts law, and also that allegations that an unwanted odor permeated the building and resulted in a loss of use of the building are reasonably susceptible to an interpretation that physical injury to property has been claimed. Further, since nothing in Essex's policies suggests that odor cannot constitute physical injury to property, Suffolk's claim is colorable under the policies. See W. Fire Ins. Co., 437 P.2d at 56.

### B. Bead-blasting of the concrete floor

Suffolk's allegation that the concrete floor required bead-blasting because of BloomSouth's negligent and defective work and materials may also be reasonably interpreted as alleging physical injury to property, viz., the concrete substrate.

Suffolk's complaint alleged that third-party property (BFDS's concrete floor) had to be bead-blasted because of BloomSouth's faulty work (the defective carpet which was placed upon the concrete floor). The import of this allegation is that BloomSouth's carpet, or its installation, caused physical injury to BFDS's concrete floor. That is essentially the view of Suffolk's allegation that the magistrate judge adopted. The court, in paraphrasing Suffolk's complaint, stated, "Suffolk seeks

-15-

remuneration for . . . bead-blasting the concrete []floor to eradicate VOC contamination caused by the [carpet] or its installation."[4]

Essex argues that Suffolk's bead-blasting allegation cannot be reasonably construed as indicating physical injury to property. It asserts that "The allegation itself conclusively establishes that the 'bead-blasting' was part of the replacement process for the defective carpet."

We reject Essex's argument. The claim that Suffolk's allegation conclusively establishes that bead-blasting was part of a replacement process -- as opposed to a remedial measure -- is overstated. As we have noted, the allegation is reasonably susceptible to a different interpretation: the one adopted by the magistrate judge. Moreover, were we to read the complaint as Essex suggests, we would be endorsing a more exacting pleading standard than currently exists for establishing the duty to defend. See Lee v. Aetna Cas. & Sure. Co., 178 F.2d 750, 753 (2d Cir. 1949) (L.

---

[4] A Massachusetts appellate court has used similar logic in determining that a complaint alleged physical injury to property. In Sterilite, the underlying third-party complaint alleged, in relevant part, that the third-party "incurred losses and suffered damages including . . . increased costs of obtaining replacement trays . . . ." 458 N.E.2d at 341. Although the allegation did not mention any physical injury to the trays, the court noted, "The reference in the complaint to the costs of replacing trays ought to be enough to allow proof of physical damage of the trays." Id. at 342. Here, similarly, Suffolk never explicitly alleged that the carpet "physically injured the floor." But, the allegation that the floor required bead-blasting may be reasonably construed as indicating the carpet caused such injury.

Hand, J.) ("When . . . the complaint comprehends an injury which may be within the policy, we hold that the promise to defend includes it") (cited with approval in Sterilite); see also Sterilite Corp., 458 N.E.2d at 341 ("There is no requirement that the facts alleged in the complaint specifically and unequivocally make out a claim within the coverage.") (citation omitted).

### C. Exclusions

Having determined that Suffolk's and BFDS's allegations can be reasonably interpreted as giving rise to a duty to defend, we next consider whether the business risk exclusions nonetheless relieve Essex of its duty to defend. The appellant argues that exclusion (m) is not applicable, because Suffolk's allegation did not involve "impaired property" as that term is defined in the policies. It contends that exclusion (k) does not apply either, because Suffolk's allegation that the concrete floor had to be bead-blasted showed there was damage to a third party's real property -- BFDS's concrete floor -- rather than damage to BloomSouth's own product. Thus, the argument goes, the court's determination that exclusion (k) applied was erroneous because this exclusion operates to deny coverage only for damage to the insured's own product.

### 1. Exclusion (m)

We begin our analysis with the broad observation that exclusion (m) is one of several "business risk exclusions" in a

-17-

Commercial General Liability policy.  These "business risks"  are

those:

> which management can and should control or
> reduce to manageable proportions; risk which
> management cannot effectively avoid because of
> the nature of the business operations; and
> risks which relate to the repair or
> replacement of faulty work or products.  These
> risks are a normal, foreseeable and expected
> incident of doing business and should be
> reflected in the price of the product or
> service rather than as a cost of insurance to
> be shared by others.

Sterilite Corp., 458 N.E.2d at 323 n.13 (citation and internal

quotation marks omitted).  Thus, a distinction is drawn between

"faulty workmanship" claims involving only the insured's own work

product, for which a defense need not be provided, and claims for

damage to the property of a third party, for which a defense is

required.  Frankel v. J. Watson, Inc., 484 N.E.2d 104, 106 (Mass.

App. Ct. 1985).

Exclusion (m) bars coverage for property damage to

"impaired property," which the exclusion internally defines as

"property that has not been physically injured." (emphasis added).[5]

Further, for the exclusion to apply the alleged damage must arise

---

[5]  Under the policies' definition, "property damage" may be
manifested by either (i) physical injury to tangible property,
including all resulting loss of use of that property, or (ii) the
loss of use of tangible property that is not physically injured.
Thus, exclusion (m) serves to exclude coverage for non-physical
injury to tangible property that arises from (or in other words is
caused by) the insured's defective product or work.

out of "a defect, deficiency, inadequacy, or dangerous condition in the insured's product or work."

The first reason why the exclusion does not apply is plain. Suffolk's complaint alleged that odor "permeated the building." As we have concluded, this allegation is reasonably susceptible to an interpretation that the odor physically injured the property.

The policies' more detailed definition of "impaired property" provides the second reason for concluding that the exclusion is inapplicable. The policies define "impaired property" as tangible property, other than the insured's product or work, that cannot be used or is less useful because it incorporates part of the insured's product or work that is "known or thought to be defective, deficient, inadequate, or dangerous." This definition is, however, somewhat narrowed by a condition that property is "impaired property" only if such property can be restored to use by (i) the repair, replacement, adjustment, or removal of the insured's product or work, or (ii) the insured's fulfilling the terms of its contract or agreement.

Although the complaint alleges property damage (odor) to tangible property (the building) that cannot be used or is less useful because it incorporates the insured's defective, deficient, inadequate, or dangerous product (the carpet), we also must consider the definition's internal limiting condition. Property

-19-

can only be "impaired property" if it can be restored to use by "the repair, replacement, adjustment or removal of [the insured's] product or [] work." If it cannot be so restored, then it is not "impaired property." <u>Dorchester Mut. Fire Ins. Co.</u> v. <u>First Kostas Corp., Inc,</u> 731 N.E.2d 569, 572 (Mass. App. Ct. 2000) ("Other cases implicating this exclusion have turned on the fact that the exclusion applies only if the damaged property can be restored to use by the 'repair, replacement, adjustment or removal' of the insured's work.") (citation omitted).

A fair reading of Suffolk's complaint suggests the property could <u>not</u> be restored to use simply by repairing, replacing, adjusting, or removing BloomSouth's product or work. The allegations thus fall outside the definition of impaired property. Suffolk's complaint states in relevant part, "as a result of the defendant's negligent and defective work and materials, and in order to eliminate the alleged odor . . . Suffolk expended monies in attempting to remediate the alleged odor . . . including . . . <u>the installation of carbon air filters to the ventilation system in the building</u>." (emphasis added).[6]

---

[6] Suffolk's initial complaint contained a specific allegation concerning the installation of carbon filters. The amended complaints do not contain this allegation but rather general allegations that Suffolk spent money in an attempt to remediate the alleged odor. These may be read in conjunction with the earlier allegations. <u>Boston Symphony Orchestra, Inc.</u>, 545 N.E.2d at 1158 (prior allegations known to insurer must be considered by insurer in determining whether to defend).

Admittedly, there is no express indication in the complaint that the installation of the air filters actually restored the property to use. On the other hand, neither is there any indication that repairing, replacing, adjusting, or removing the defective product (the carpet) restored the property to use. The closest the complaint comes to using such language is in the allegation that reads, "Suffolk was ultimately required to pay BFDS for removal of the existing carpet . . . and adhesives, bead-blasting of the concrete floor and replacement of the carpet [] and related materials." But even this language indicates that "bead-blasting," a remedial effort that may be distinct from removal and replacement of the carpet, was necessary to restore the property to use. A legitimate reading of the complaint is that Suffolk attempted to remediate the alleged injury (odor) by installing carbon air filters and bead-blasting the concrete floor. Whether it was these actions, the removal and replacement of the offending carpet, or some combination that restored the building to use is unclear. What is clear is that Essex had the burden of proving the applicability of exclusion (m). See Highlands Ins. Co., 676 N.E.2d at 804. Such a hurdle simply cannot be cleared given the wording of Suffolk's complaint.[7]

---

[7] BloomSouth argues that in the event exclusion (m) does bar coverage an exception to the exclusion operates to restore coverage. Because exclusion (m) is inapplicable we need not address this argument.

-21-

We express no opinion on the issue of whether the alleged odor damage here will ultimately require indemnification. A Massachusetts court may conclude that odor in general, or this odor in particular, does not constitute "physical injury" to the property. Moreover, exclusion (m) may serve to deny indemnification if, for example, a fact-finder determines that removing or replacing the carpet alone would have sufficed to restore the property to use.

## 2. Exclusion (k)[8]

The magistrate judge found that coverage for the claim for damage to the concrete floor was barred by exclusion (k), which proscribes coverage for "Property damage to 'your product' arising out of it or any part of it." The definition section of the policy provides:

'Your Product' means

a. Any goods or products, other than real property, manufactured, sold, handled or distributed or disposed of by:

(1) You;

(2) Others trading under your name; or

(3) A person or organization whose business or assets you have acquired

---

[8] Although the magistrate judge discussed other exclusions in addition to exclusion (k), it noted that further factual development may trigger exceptions in other exclusions causing them to become inapplicable. As such, its finding that exclusion (k) unequivocally served to exclude coverage for property damage to the floor was the key to its analysis.

-22-

The language employed by the exclusion does not relieve Essex of its duty to defend. Where, as here, the complaint alleges damage to "real property" the exclusion cannot apply because it excludes coverage only for damage to goods or products, "other than real property." See CU Lloyd's of Texas v. Main St. Homes, Inc., 79 S.W.3d 687, 697 (Tex. App. 2002) (agreeing with another court that the definition of "'your product'" in a similar exclusion "does not apply to a building and its components"). In this case, Suffolk's complaint alleged damage to "real property," specifically, BFDS's concrete floor. In addition, the policy further defines the insured's "product" as any good or product "manufactured, sold, handled or distributed or disposed of by" the insured or the insured's agents. There is no indication in this case that BloomSouth or its subcontractors "manufactured, sold, handled, or distributed or disposed of" the concrete floor.[9]

The district court elided the policy language by reasoning that the concrete floor became BloomSouth's product, thus bringing Suffolk's claim within the reach of exclusion (k). The court stated, "BloomSouth's 'product' and 'work' includes the Subcontract's requirements for the [concrete] subfloor even though

---

[9] Although it might be argued that BloomSouth "handled" the floor because it touched the floor when laying carpet, that description of BloomSouth's work is too broad. See National Union Fire Ins. Co. of Pittsburgh, Pa. v. Structural Sys. Tech., Inc., 756 F. Supp 1232, 1239 (E.D. Mo. 1991)(amended by 764 F.Supp. 145 (E.D. Mo. 1991), aff'd, 964 F.2d 759 (8th Cir. 1992)(defining handled as "to deal or trade in" rather than to touch)).

-23-

BloomSouth did not build the [concrete] subfloors," and "BloomSouth's 'product' of labor and/or materials damaged the surface of the subfloors, which were also within BloomSouth's product." We reach a different conclusion.

As opposed to the carpet itself -- which BloomSouth concedes is its "product" -- the pre-existing building structures, including the concrete subfloor over which the carpet was to be installed, are "real property," and are thus excluded from the definition of "product." Two Massachusetts appellate decisions inform this conclusion. In Frankel, the court found that damage to the superstructure of a farmhouse caused by the insured's faulty construction of a foundation -- onto which the farmhouse was to be moved -- could be the basis of a covered claim because it distinguished between "damage to the work product of the insured" (the foundation) and "damage to larger units of which the insured's work product is but a component." 484 N.E.2d at 105-06 (citations omitted).

In addition, despite a finding that coverage did not exist, Mello Construction, Inc. v. Acadia Ins. Co., 874 N.E.2d 1142, 2007 WL 2908267 (Mass. App. Ct. 2007)(unpublished), is also instructive. In Mello, the insured general contractor sought coverage for allegations that it or its subcontractor improperly installed a concrete slab as part of a school construction project. Id. at ***1. The insured had to fix the slab, as well as perform

-24-

repairs to paint, mechanical systems, and floors, and sought reimbursement from the carrier. Id. at ***2, ***4. The insured relied on Frankel, but the court distinguished it because the insured's "work product, as general contractor, encompassed the entire elementary school." Concluding that the entire school was "the insured's particular work," the court found no coverage. Id. at ***5-6. The circumstances here are more akin to those in Frankel than to those in Mello. Like the foundation in Frankel, the carpet was "but a component," while the underlying complaint alleged damage to "the larger unit."[10]

Additionally, we do not believe that an insured would reasonably understand exclusion (k) to bar coverage for property damage to third-party property such as the subfloor, that was, at all times, part of the building in which it was working in just the same way as the walls, ceilings and windows. The court's conclusion that the subfloor "became" BloomSouth's product stretches too far the contours of what an insured might reasonably understand.

Essex, for its part, gives us no good reason to affirm the court's decision regarding exclusion (k). Specifically, Essex

---

[10] The district court found support in Commerce Ins. Co. v. Betty Caplette Builders, Inc. 647 N.E.2d 1211 (Mass. 1995) for its conclusion that the building was BloomSouth's product. We find the reliance to be misplaced. In Caplette, as in Mello, the insured was a developer. Thus, its "product" was the completed building. Here, however, similar to the scenario in Frankel, the carpet is a component of the larger building.

fails to offer any reasoned argument in support of the court's conclusion that the concrete floor became BloomSouth's product for purposes of the exclusion. Instead, Essex states that "The defective carpet is clearly BloomSouth's product. Just as clearly, it does not constitute real property." While we may agree with Essex on this point, BloomSouth's argument is that Suffolk's complaint may be reasonably construed as alleging that the carpet caused damage to a third party's real property -- BFDS's concrete floor. Essex's statement is not responsive to this argument.

In sum, we conclude that exclusion (k) does not relieve Essex of its duty to defend, and summary judgment for Essex on this basis cannot be sustained. Again, as was the case with the complaint of a permeating odor, we express no opinion on the question of whether Essex will ultimately be required to indemnify BloomSouth for the damage caused to the concrete floor.

## D. Attorney's Fees

BloomSouth argues that it is entitled to recover attorney's fees incurred in establishing that Essex breached its duty to defend. In Massachusetts, an insured generally is entitled to recover attorney fees incurred in successfully establishing that its insurer breached its duty to defend. Preferred Mutual Ins. Co. v. Gamache, 686 N.E.2d 989, 993 (Mass. 1997). BloomSouth is directed to file its attorney's fees application in the district

court, in accordance with Local Rule 39.1(b) of the First Circuit Court of Appeals.

### III. Conclusion

Because the allegations in Suffolk's complaint are reasonably susceptible to an interpretation that they state covered claims and because those allegations do not prove the applicability of the business risk exclusions in the Essex policies, we hold that Essex erroneously denied a defense to BloomSouth. Accordingly, the court's grant of summary judgment to Essex is **reversed**, and we remand for proceedings not inconsistent with this opinion.