# State of New York Court of Appeals

OPINION

This opinion is uncorrected and subject to revision before publication in the New York Reports.

No. 7
Consolidated Restaurant
Operations, Inc.,
     Appellant,
      v.
Westport Insurance Corporation,
     Respondent.

Robin L. Cohen, for appellant.
Aidan M. McCormack, for respondent.
Chefs' Warehouse Inc. et al., United Policyholders, American Property Casualty
Insurance Association et al., Metropolitan Transportation Authority et al., Medical
Society of the County of Erie, Envision Healthcare Operating, Inc., American Museum of
Natural History, New York State Trial Lawyers Association, Caesars Entertainment, Inc.,
amici curiae.

HALLIGAN, J.:

This appeal presents the question of whether allegations that SARS-Co-V-2, the

virus that causes COVID-19 ("coronavirus" or "virus"), was present in insured restaurants

and resulted in cessation of in-person dining services and related business interruption

losses are sufficient to state a claim for "direct physical loss or damage," as that phrase is used in plaintiff's property insurance policy. We hold that direct physical loss or damage requires a material alteration or a complete and persistent dispossession of insured property, which petitioner has not alleged. We therefore affirm the order below dismissing the complaint.

I.

Consolidated Restaurant Operations (CRO), a company that owns and operates dozens of restaurants, obtained from Westport Insurance Corporation (Westport) an "all-risk" commercial property insurance policy covering the period from July 1, 2019 through July 1, 2020. Subject to certain exclusions, the policy insured "all risks of direct physical loss or damage to insured property" and business interruption losses "directly resulting from direct physical loss or damage" to insured property. The policy is governed by New York law under its express terms.

Beginning in late 2019 and early 2020, the spread of the coronavirus led to a global pandemic with devastating impacts worldwide. In addition to the severe consequences for human health and mortality, many business owners and the economy at large suffered tremendously. According to a report by the World Bank, the COVID-19 pandemic triggered "the largest global economic crisis in more than a century" (The World Bank, World Development Report 2022: Finance for an Equitable Recovery at 1, https://openknowledge.worldbank.org/bitstream/handle/10986/36883/9781464817304.pdf).

CRO, like many businesses directly serving the public, sustained a significant reduction in revenue during the pandemic. In its original complaint, CRO alleged that it was forced to suspend or substantially curtail its operations due to the presence of the coronavirus in its restaurants and government restrictions on nonessential businesses. CRO sought coverage for the ensuing loss of revenue and, after Westport denied coverage, commenced this action seeking a declaration as to Westport's obligations under the policy and damages for breach of contract. Westport moved to dismiss for failure to state a cause of action, arguing that CRO could not establish that the coronavirus caused "direct physical loss or damage" to its properties as a matter of law.

Supreme Court declared that the policy did not cover CRO's alleged losses and granted Westport's motion to dismiss. Relying upon the construction of identical policy language in *Roundabout Theatre Co. v Continental Cas. Co.* (302 AD2d 1 [1st Dept 2002]) and *Northwell Health, Inc. v Lexington Ins. Co.* (550 F Supp 3d 108 [SD NY 2021]), the court acknowledged that the alleged cause of CRO's business interruption was something physical—the coronavirus. Supreme Court concluded, though, that CRO had not alleged that its premises were "uninhabitable" or in need of repair or replacement, and thus had not adequately alleged a resulting physical loss or damage to insured property. The court later denied as futile that part of a motion in which CRO sought leave to amend its complaint.

The Appellate Division affirmed the first Supreme Court order and that part of the subsequent order denying leave to amend the complaint (205 AD3d 76, 87 [1st Dept 2022]). The court first considered the meaning of the phrase "direct physical loss or damage," which it had interpreted in *Roundabout* "to mean something that directly happens

to the property resulting in physical damage to it" (205 AD3d at 82, citing *Roundabout*, 302 AD2d 1). It concluded that *Roundabout* was "factually distinguishable" (*Roundabout* involved a wholly exogenous event—a street closure—and no allegations of a physical substance on the insured premises) but still "a useful starting point" (*id.*). The court noted that numerous federal and state court cases had applied both New York law and the law of other states to hold that the terms "direct" and "physical," as they relate to "damage or loss to property," require "a direct physical loss of property, not simply the inability to use it" (*id.* at 83-85). The court concluded that "the plain meaning of 'physical' as commonly understood, requires some tangible alteration of the property," reasoning that "the words 'direct' and 'physical' modify or qualify the phrase 'loss or damage' to require a showing of actual, demonstrable physical harm of some form to the insured premises" (*id.* at 84, 85).

Turning to the pleadings, the Appellate Division held that CRO's allegations that the coronavirus physically altered its properties were too "conclusory" to withstand a motion to dismiss (*id.* at 83). CRO had not identified "any physical change, transformation, or difference in any of its property," the court observed, and absent such allegations, the complaint failed to state a cause of action (*id.* at 86). CRO's "statement that [coronavirus] particles and droplets damage property is merely a conclusion that will not save the complaint from dismissal" (*id.*). Nor would the proposed amended complaint require a different result, the court determined, because it "failed to identify any physical change, transformation, or difference in any of its property" (*id.*). The court concluded that because "[t]he additional facts that [CRO] seeks to add" in its proposed amended complaint "do not

remedy" the pleading "defect," the motion for leave to amend was properly denied (*id.* at 87).

This Court granted CRO leave to appeal from the Appellate Division order to the extent that it affirmed dismissal of the complaint and granted judgment in favor of Westport (*see* 39 NY3d 943 [2022]).[1]

## II.

As with any motion to dismiss, we must give CRO's pleadings "a liberal construction, take the allegations of the complaint as true and provide plaintiff the benefit of every possible inference" (*EBC I Inc. v Goldman, Sachs & Co.*, 5 NY3d 11, 19 [2005]; *see also* CPLR 3026 [directing that "(p)leadings shall be liberally construed" and "(d)efects shall be ignored if a substantial right of a party is not prejudiced"]).  A motion to dismiss "must be denied if from the pleadings' four corners 'factual allegations are discerned which taken together manifest any cause of action cognizable at law' " (*511 W. 232nd Owners Corp v Jennifer Realty Co.*, 98 NY2d 144, 152 [2002]).  Furthermore, to prevail on a motion to dismiss based on documentary evidence, "the moving party (here, the Insurers) must establish that the documentary evidence 'conclusively refutes' the plaintiff's

---

[1] Because CRO sought leave to amend its complaint in a motion that postdated the August 2021 judgment, the Appellate Division order, insofar as it affirmed that part of Supreme Court's September 2021 order denying leave to amend, is nonfinal and hence nonappealable to this Court.  Accordingly, we granted leave to appeal only in part, and we dismissed CRO's motion for leave to appeal, on finality grounds, from so much of the Appellate Division order as resolved the appeal from Supreme Court's September 2021 order (*see* 39 NY3d 943).  Any issues relating to the proposed amended complaint are therefore not properly before us.

allegations" (*J.P. Morgan Sec. Inc. v Vigilant Ins. Co.*, 21 NY3d 324, 334 [2013], quoting *AG Capital Funding Partners, L.P. v State St. Bank & Trust Co.*, 5 NY3d 582, 591 [2005]).

Under New York law, insurance contracts are construed by applying general principles of contract interpretation (*see Universal Am. Corp. v National Union Fire Ins. Co. of Pittsburgh, Pa.*, 25 NY3d 675, 680 [2015]). A contractual provision is unambiguous if its language has "a definite and precise meaning, unattended by danger of misconception in the purport of the policy itself, and concerning which there is no reasonable basis for a difference of opinion" (*Breed v Insurance Co. of N. Am.*, 46 NY2d 351, 355 [1978]). Unambiguous provisions of an insurance contract, like any contract, "must be given their plain and ordinary meaning, and the interpretation of such provisions is a question of law for the court" (*Universal Am. Corp.*, 25 NY3d at 680, quoting *Vigilant Ins. Co. v Bear Stearns Cos., Inc.*, 10 NY3d 170, 177 [2008] [internal quotation marks omitted]). On the other hand, "any ambiguity must be construed in favor of the insured and against the insurer" (*White v Continental Cas. Co.*, 9 NY3d 264, 267 [2007]).

CRO advances two primary arguments for reversal and reinstatement of its complaint. It first contends that the Appellate Division erred in interpreting "direct physical loss or damage" to require "tangible, ascertainable damage, change or alteration to the property" because that formulation, according to CRO, does not give the words "physical loss" independent meaning. CRO would have us read the phrase more broadly, to encompass situations where a physical event occurs on insured property and impairs its functionality or renders it, in whole or in part, unusable for its intended purpose. Second, CRO argues that even if the policy is read to require physical alteration to its property, it

alleged as much.  Westport disputes each of these points, and further argues that coverage was independently barred by several exclusions in the policy.  We hold that "direct physical loss or damage" requires a material alteration or a complete and persistent dispossession of insured property, which CRO did not allege.  Because we conclude that the policy thus does not cover CRO's claims, we do not reach the question of whether the policy exclusions are triggered here.

A.

The first question before us is what the relevant provisions of the insurance policy mean.  CRO's all-risk commercial property insurance policy provides in relevant part that it "insures all risks of direct physical loss or damage to INSURED Property while on INSURED LOCATION(S) . . . ."  Insured property is defined to include both real property and personal property owned by CRO.  The policy also insures against business interruption, referred to as "TIME ELEMENT loss," "during the Period of Liability directly resulting from direct physical loss or damage insured by this POLICY to INSURED PROPERTY at INSURED LOCATION(S) . . . ."  The period of liability "for building and equipment" is defined as "the period of time" "[s]tarting on the date of physical loss or damage insured by this POLICY to INSURED PROPERTY," and "[e]nding when with due diligence and dispatch the building and equipment could be

repaired or replaced with current materials of like size, kind and quality and made ready for operations; . . . ."[2]

To interpret the phrase in question, we begin with each of its constituent words (*see Universal Am. Corp.*, 25 NY3d at 680-681 [utilizing dictionary definitions of constituent words to construe undefined policy phrase]). Direct means "marked by absence of an intervening agency, instrumentality, or influence" (Merriam-Webster.com Dictionary, direct [https://www.merriam-webster.com/dictionary/direct]). Physical means "[o]f, relating to, or involving material things; pertaining to real, tangible objects" (Black's Law Dictionary [11th ed 2019], physical). Loss means "[t]he failure to maintain possession of a thing" (Black's Law Dictionary [11th ed 2019], loss; *accord Wilson v USI Ins. Serv. LLC*, 57 F4th 131, 141-142 [3d Cir 2023]; *Terry Black's Barbecue, L.L.C. v State Auto. Mut. Ins. Co.*, 22 F4th 450, 456 [5th Cir 2022]; *Santo's Italian Café LLC v Acuity Ins. Co.*, 15 F4th 398, 401 [6th Cir 2021]; *Estes v Cincinnati Ins. Co.*, 23 F4th 695, 700 [6th Cir 2022]), and "damage" means the "loss or harm resulting from injury to person, property, or reputation" (Merriam-Webster.com Dictionary, damage [https://www.merriam-webster.com/dictionary/damage]; *accord Wilson*, 57 F4th at 142; *Uncork & Create LLC v Cincinnati Ins. Co.*, 27 F4th 926, 932 [4th Cir 2022]). And because the words "direct" and "physical" both modify the phrase "loss or damage," we read the phrase "direct physical

---

[2] CRO notes that it purchased additional coverage for the "reasonable and necessary costs incurred" for "cleanup, removal[,] and disposal of the actual not suspected presence of COMMUNICABLE DISEASES" if property use was limited, restricted, or prohibited by a government order or company officer, but CRO's complaint did not seek coverage under this provision, which was capped at $250,000 annually.

loss or damage" to mean "direct physical loss" or "direct physical damage" (*see Starr Surplus Lines Ins. Co. v Eighth Jud. Dist. Ct. in and for County of Clark*, — Nev — , —,, 535 P3d 254, 261 [2023] ["In the phrase 'direct physical loss or damage,' both 'direct' and 'physical' function as prepositive modifiers giving meaning to "loss" and "damage" individually"]).

"Physical damage" must be understood to require a material physical alteration to the property—one that is perceptible, even if not visible to the naked eye (*accord Huntington Ingalls Indus., Inc. v Ace Am. Ins. Co.*, 287 A3d 515, 527-528, 2022 VT 45, ¶ 26 [2022]). CRO contends that it has alleged a material physical alteration—specifically, the presence of the coronavirus at its restaurants. For the reasons set forth in Point II.B below, we disagree.

Turning to "direct physical loss," CRO argues that this phrase encompasses impaired functionality and either a partial or complete loss of use for a limited period of time. That reading is untenable, though, because it would collapse coverage for "direct physical loss" into coverage for "loss of use" (*see Northwell Health*, 550 F Supp 3d at 117; *cf. Schlamm Stone & Dolan, LLP v Seneca Ins. Co.*, 6 Misc. 3d 1037[A], 2005 NY Slip Op 50324[U], *4 [Sup Ct, NY County 2005] [interpreting insurance policy that defines "property damage" to include "loss of use of tangible property which has not been physically injured or destroyed"]; 10A Steven Plitt et al., Couch on Insurance § 148:47 [3d ed June 2020] [discussing insurance policy that defines "property damage" to include "loss of use of tangible property which has not been physically injured or destroyed"]). "[L]osing a thing is conceptually different than losing the functional use of that thing for a

period of time" (*Tapestry, Inc. v Factory Mut. Ins. Co.*, 482 Md 223, 244, 286 A3d 1044 [2022]; *see also Chief of Staff LLC v Hiscox Ins. Co. Inc.*, 532 F Supp 3d 598, 602 [ND Ill 2021]; *Santo's*, 15 F4th at 402). To take a practical example, forgetting the password to unlock one's phone is quite different than losing possession of it entirely because it has been stolen or inadvertently left somewhere. "This distinction is clear enough that had the parties intended the policy to cover a loss of use of property, they would have said so explicitly" (*Terry Black's*, 22 F4th at 457-458). "Direct physical loss" thus requires more than loss of use; it requires an actual, complete dispossession.

Our reading is bolstered by other provisions in CRO's policy. The "Time Element" provision provides coverage for "TIME ELEMENT loss, during the Period of Liability, directly resulting from direct physical loss or damage . . . to the INSURED PROPERTY." Thus, the insured must suffer direct physical loss that in turn causes "time element" (i.e., business interruption) losses. Reading "direct physical loss" to include loss of use is circular and fails to give distinct meaning to the two concepts (*see Tapestry*, 482 Md 223, 245, 286 A3d 1044, 1056-1057; *Verveine Corp. v Strathmore Ins. Co.*, 489 Mass 534, 541 184 NE3d 1266, 1274 [2022]). Additionally, the period of liability provision references the time for "repair[ing]" or "replac[ing]" buildings and equipment and restoring them to "the same or equivalent physical and operating conditions that existed immediately prior to such physical loss or damage," and similarly, the time element coverage provision requires the insured to act with due diligence in "repairing or replacing physically damaged buildings and equipment." The words "repair" and "replace" are fairly read to contemplate physical damage to or complete and persistent dispossession of the insured property, rather

than loss of use of it. Thus, construing "direct physical loss or damage" to require physical damage or complete and persistent dispossession harmonizes the relevant provisions of the policy (*accord Uncork & Create LLC*, 27 F4th at 932 & n 9; *Sandy Point Dental, P.C. v Cincinnati Ins. Co.*, 20 F4th 327, 333 [7th Cir 2021]; *Oral Surgeons, P.C. v Cincinnati Ins. Co.*, 2 F4th 1141, 1144 [8th Cir 2021]; *Mudpie, Inc. v Travelers Cas. Ins. Co. of Am.*, 15 F4th 885, 892 [9th Cir 2021]; *Goodwill Indus. of Cent. Oklahoma, Inc. v. Philadelphia Indem. Ins. Co.*, 21 F4th 704, 711 [10th Cir 2021]; *SA Palm Beach, LLC v Certain Underwriters at Lloyd's London*, 32 F4th 1347, 1361-1362 [11th Cir 2022]; *Tapestry*, 482 Md at 244-246, 286 A3d at 1056-1057; *see also Newman Myers Kreines Gross Harris, P.C. v Great N. Ins. Co.*, 17 F Supp 3d 323, 332 [SD NY 2014] ["construing 'direct physical loss or damage' to require actual, physical damage to the insured premises gives effect to all provisions of the Policy"]).[3]

CRO invokes *Western Fire Ins. Co. v First Presbyterian Church* (165 Colo 34, 437 P2d 52 [1968]) and various subsequent cases which hold that loss of a premises' use due to infiltration of gasoline, fumes, or a similar substance constitutes "direct physical loss."[4]

---

[3] CRO notes that its policy lacks a "virus exclusion," but that does not confer coverage. CRO also points out that its policy excludes certain invisible, noxious substances (e.g., microorganisms and contaminants), but "exclusion clauses subtract from coverage rather than grant it'' (*Raymond Corp. v National Union Fire Ins. Co. of Pittsburgh, Pa.*, 5 NY3d 157, 163 [2005] [citation omitted]).

[4] Some of the decisions CRO cites for this proposition suggest there has been some element of physical damage to the property itself (*see e.g. Essex Ins. Co. v BloomSouth Flooring Corp.*, 562 F3d 399, 404-405 [1st Cir 2009] ["the presence of a permeating odor" caused "physical injury to property"]; *Gregory Packaging, Inc. v Travelers Prop. Cas. Co. of Am.*, 2014 WL 6675934, *5, 2014 US Dist LEXIS 165232, *13-15 [D NJ Nov. 25, 2014, Civ.

The rationale of these decisions appears to be that total uninhabitability is akin to physical dispossession, and thus to "direct physical loss" (*see e.g. Western Fire*, 165 Colo at 38-40, 437 P2d at 55; *Sandy Point Dental*, 20 F4th at 334 ["the gas infiltration (in *Western Fire*) . . . was so severe that it led to complete dispossession—something easily characterized as a 'direct physical loss' "]; *Wilson*, 57 F4th at 142 [insured "must show that the functionalities of their properties were nearly eliminated or destroyed, that the structures were made useless or uninhabitable, or that there was an imminent risk of either of those things happening"]; *cf. Huntington*, 287 A3d 515, 2022 VT 45 [suggesting in dicta that deprivation of use is "direct physical loss," but resolving case based on allegations of "direct physical damage"]).  In general, these cases have found coverage only where physical contamination is "persistent" and complete—i.e., contamination that "eliminate[s]" "the function of the building" (*Kim-Chee LLC v Philadelphia Indem. Ins. Co.*, 535 F Supp 3d 152, 161 [WD NY 2021], *affd* 2022 WL 258569, 2022 US App LEXIS 2655 [2d Cir, Jan. 28, 2022, 21-1082-cv]).   Other decisions have reached the opposite result, though, holding that "direct physical loss or damage" requires a physical alteration, not just contamination to the point of uninhabitability (*see Uncork & Create*, 27 F4th at 932 & n 9; *accord* 10A Couch on Insurance § 148:46).

---

No. 2:12-CV-04418 (WHW)(CLW)] [relying on precedent involving physical damage]). Others provide insufficient factual detail to understand the basis for the court's conclusion (*see e.g. Farmers Ins. Co. of Or. v Trutanich*, 123 Or App 6, 10, 858 P2d 1332, 1335[Or 1993] ["pervasive odor" is "physical" because it "damaged" house]; *Sentinel Mgt. Co. v New Hampshire Ins. Co.*, 563 NW2d 296, 300-301 [Minn 1997] [asbestos contamination may result in "direct physical loss," even though buildings were not uninhabitable]).

CRO cites several cases applying New York law, but upon close reading, they do not shed much light on this question. *Schlamm Stone* held that the presence of post-9/11 noxious particles in the air and on surfaces constituted "property damage," but that is "direct physical damage," not "direct physical loss," and the policy there explicitly defined "property damage" to include "loss of use of tangible property which has not been physically injured or destroyed" (2005 NY Slip Op 50324[U], *4). In *Port Authority*, the Third Circuit reasoned that elimination of a property's "function" or "utility" due to asbestos contamination could trigger coverage for "physical loss," but offered no specific decisional support for its conclusion (*Port Auth. of New York & New Jersey v Affiliated FM Ins. Co.*, 311 F3d 226, 236 [3d Cir 2002]).

Because CRO has alleged neither persistent contamination nor total uninhabitability of its restaurants, we need not decide today whether such allegations could fairly be equated with actual material dispossession, and thus "direct physical loss" (*cf. Sandy Point*, 20 F4th at 334 ["This is not to say that no circumstances can exist under which a loss of use, unaccompanied by any physical alteration to property, might be so pervasive as effectively to qualify as a complete physical dispossession of property and thus a 'direct physical loss.' . . . We leave these questions for another day"]; *Santo's*, 15 F4th at 401 ["Correctly decided or not, these cases (involving coverage for uninhabitable property) stand a significant step removed from today's dispute. (Plaintiff) has not alleged that its property is unusable or uninhabitable"]).

Indeed, CRO's complaint makes clear that neither of those conditions is met. Although the complaint alleges that the coronavirus rendered its restaurants "unusable"

such that it had to "suspend[ ] or severely curtail[ ] [its] operations" and "limit[ ] [its] on-premises dining and operations," it does not allege a complete shutdown—for example, that its employees could not enter the restaurants or that they could not provide take-out and delivery services. And while CRO alleges that it was "forced to close 30 restaurants," nowhere does it allege that those closures were because the properties themselves were contaminated to the point of uninhabitability, as opposed to prudent economic decisions in light of lost "foot-traffic." Even if we were to generously construe the complaint to allege that the presence of the coronavirus prompted various remediation efforts (e.g. adding physical partitions at its restaurants, increasing the distance between tables, and implementing stringent cleaning procedures), as does the proposed amended complaint, that would not yield a different result. These efforts, even if useful to facilitate in-person dining, do not establish that the restaurants were completely uninhabitable until property was repaired or replaced (*see Starr Surplus Lines*, 535 P3d at 261 ["social-distancing, plexiglass installation, sanitizing mechanisms, and regular cleaning . . . do not aim to 'repair, rebuild, or replace' the property; they aim to redress the way people pose harm to one another by carrying and transmitting the virus at the property"] [cleaned up]). Nor does CRO allege a permanent impact; its complaint alleges only that the coronavirus "can survive on surfaces for days and even weeks." These allegations do not amount to persistent and complete uninhabitability.

Our reading of the phrase "direct physical loss or damage" is consistent with that applied by federal courts in COVID-19 insurance coverage cases governed by New York law (*see e.g. 10012 Holdings, Inc. v Sentinel Ins. Co.*, 21 F4th 216, 221 [2d Cir 2021]

[noting that court had identified "no contrary authority in New York that diverges from the holding in *Roundabout*, which state and federal courts in New York have (at either the motion to dismiss stage or on summary judgment) uniformly applied since the start of the COVID-19 pandemic to deny coverage under similar insurance provisions where the insured property itself was not alleged or shown to have suffered direct physical loss or physical damage"]; *Kim-Chee*, 2022 WL 258569, *2, 2022 US App LEXIS 2655, *4-5; *Northwell Health*, 550 F Supp 3d at 117).

Our conclusion also accords with the views of other jurisdictions across the country, notwithstanding variation in their precise understandings of the term "direct physical loss or damage." To our knowledge, in cases that allege loss of use due to COVID-19-related government shutdown orders, no appellate court has allowed an insurance coverage claim under similar policy terms to proceed past a motion to dismiss. And the outcomes have been no different where the alleged loss of use was due to the presence of the coronavirus on insured property (*see e.g. Colectivo Coffee Roasters, Inc. v Society Ins.*, 401 Wis 2d 660, 974 NW2d 442 [2022]; *Verveine Corp. v Strathmore Ins. Co.*, 489 Mass 534, 184 NE3d 1266 [2022]; *Indiana Repertory Theatre v Cincinnati Cas. Co.*, 180 NE3d 403 [Ind Ct App 2022]; *Tapestry, Inc. v Factory Mutual Ins. Co.* 482 Md 223, 286 A3d 1044 [2022]; *Schleicher & Stebbins Hotels, LLC v Starr Surplus Lines Ins. Co.*, 175 NH 744, 302 A3d 67 [2023]; *Starr Surplus Lines Ins. Co. v Eighth Jud. Dist. Ct. in & for Cnty. of Clark*, — Nev —, 535 P3d 254 [2023]; *Neuro-Communication Servs., Inc. v Cincinnati Ins. Co.*, 171 Ohio St 3d 606, 219 NE3d 907 [2022]; *Legal Sea Foods, LLC v Strathmore Ins. Co.*, 36 F4th 29 [1st Cir 2022]; *Wilson v USI Ins. Serv. LLC*, 57 F4th 131 [3d Cir 2023]; *Uncork*

*& Create LLC v Cincinnati Ins. Co.*, 27 F4th 926 [4th Cir 2022]; *Bridal Expressions LLC v Owners Ins. Co.*, 2021 WL 5575753, 2021 US App LEXIS 35676 [6th Cir, Nov. 30, 2021, Case No. 21-3381]; *Sandy Point Dental, P.C. v Cincinnati Ins. Co.*, 20 F4th 327 [7th Cir 2021]; *Olmsted Med. Ctr. v. Cont'l Cas. Co.*, 65 F4th 1005 [8th Cir 2023]; *Circus Circus LV, LP v AIG Specialty Ins. Co.*, 2022 WL 1125663, 2022 US App LEXIS 10298 [9th Cir, Apr. 15, 2022, No. 21-15367]; *Sagome, Inc. v Cincinnati Ins. Co.*, 56 F4th 931 [10th Cir 2023]; *SA Palm Beach, LLC v Certain Underwriters at Lloyd's London*, 32 F4th 1347 [11th Cir 2022]; *cf. Huntington Ingalls Indus., Inc. v Ace Am. Ins. Co.*, 287 A3d 515, 2022 VT 45 [2022] [resolving appeal on theory of "direct physical damage" and thus not reaching question of whether complaint alleged "direct physical loss"]).

B.

CRO next argues that even if "direct physical loss or damage" requires a physical alteration of property, they have sufficiently alleged that. We disagree. The complaint contains minimal allegations about the presence of the coronavirus in CRO's restaurants. While the complaint offers some details about how an infectious virus is transmitted from surfaces to humans, it alleges nothing specific about how the presence of the coronavirus might affect the physical integrity of structures or property. The complaint states that "droplets carrying the virus . . . are physical objects that attach to and cause harm to property," and that the coronavirus "is resilient and can survive on surfaces for days and even weeks." Without elaboration, CRO further alleges that "[t]he virus thus compromises the physical integrity of the structures it permeates and poses an imminent risk of physical damage to all other structures." But CRO does not allege there was any need to repair or

replace insured property; only business interruption losses are identified. Other allegations in the complaint concern the risk that the coronavirus poses to humans, not property. And even as to whether the coronavirus was actually present in its restaurants, CRO offered contradictory allegations, stating in its complaint that "the virus might not actually be present at the Restaurants." Even generously construed to allege that various surfaces in the restaurants became vectors for transmission of the coronavirus, CRO "fails to identify . . . a single item that it had to replace, anything that changed, or that was actually damaged at any of its properties" (205 AD3d 76, 86). As the Appellate Division found, "[n]othing stopped working" (*id.*). And the allegations themselves confirm that the presence of the coronavirus was temporary.

Our conclusion is in line with *Northwell Health*, which similarly involved allegations that virus droplets stay on surfaces, compromise the physical integrity of the structures they permeate, and render them unusable (550 F Supp 3d at 117). Those allegations, the court held, did not support the conclusion "that the coronavirus compromises the physical integrity of objects by harming surfaces and structures, as opposed to harming the people who touch them" and thus failed to state a claim (*id.*). Countless decisions across the country have likewise dismissed similar property insurance claims involving allegations that the presence of the coronavirus damaged insured property (*see e.g. Kim-Chee LLC v Philadelphia Indem. Ins. Co.*, 535 F Supp 3d 152, 161 [WD NY 2021], *affd* 2022 WL 258569, 2022 US App LEXIS 2655 [2d Cir, Jan. 28, 2022, 21-1082-cv]; *Jeffrey M. Dressel, D.D.S., P.C. v Hartford Ins. Co. of the Midwest, Inc.*, 2021 WL 1091711, 2021 US Dist LEXIS 54067 [ED NY, Mar. 22, 2021, 20-CV-

2777(KAM)(VMS)]; *Verveine Corp. v Strathmore Ins. Co.*, 489 Mass 534, 184 NE3d 1266 [2022]; *Tapestry, Inc. v Factory Mutual Ins. Co.* 482 Md 223, 286 A3d 1044 [2022]; *Bridal Expressions LLC v Owners Ins. Co.*, 2021 WL 5575753, 2021 US App LEXIS 35676 [6th Cir, Nov. 30, 2021, Case No. 21-3381]; *SA Palm Beach, LLC v Certain Underwriters at Lloyd's London*, 32 F4th 1347 [11th Cir 2022]).

Indeed, CRO has not identified, nor have we discovered, any state or federal decision that has found coverage for COVID-19-related business interruption under a policy similar to CRO's (*see e.g. Oregon Clinic, PC v Fireman's Fund Ins. Co.*, 75 F4th 1064, 1071 [9th Cir 2023] [noting that dismissal of a COVID-19 coverage claim for failure to adequately allege physical alteration is "consistent with the conclusion reached in more than 800 cases nationwide, including decisions from the federal courts of appeal and state supreme courts"]), and it appears that just one state high court—and no Federal Circuit— has allowed such a claim to proceed past a motion to dismiss (*see Huntington*, 287 A3d 515, 2022 VT 45). We agree with the weight of authority nationwide.

Because we conclude that CRO did not sufficiently allege "direct physical loss or damage," we do not reach the question of whether the exclusions in the policy apply.

\*     \*     \*

We do not take lightly the severe economic losses incurred by restaurants and other businesses serving the public as a result of the COVID-19 pandemic. But our task is to faithfully interpret the terms of the insurance policy before us, not to "rewrite the language of the polic[y] at issue" to reach a result with "equitable appeal" (*Fieldston Prop. Owners Assn., Inc. v Hermitage Ins. Co., Inc.*, 16 NY3d 257, 265 [2011]). The coverage provisions

relied upon by CRO only cover economic losses to the extent they are caused by "direct physical loss or damage" to insured property.  We conclude that the business interruption caused by the actual presence of the coronavirus on the premises of CRO's insured property, as alleged in the complaint, is insufficient to trigger such coverage.

Accordingly, the order of the Appellate Division insofar as appealed from should be affirmed, with costs.

Order insofar as appealed from affirmed, with costs. Opinion by Judge Halligan. Judges Rivera, Garcia, Singas, Cannataro, Troutman and Connolly concur. Chief Judge Wilson took no part.

Decided February 15, 2024